759 F.2d 280
 1986 A.M.C. 114
 EAST COAST TENDER SERVICE, INC.,
v.
ROBERT T. WINZINGER, INC., Utah Home Fire Insurance Company,
Great Atlantic Insurance Company, Various
Underwriters as their Interests May
Appear in the Term British Markets.
and
ROBERT T. WINZINGER, INC., Appellee/Cross-Appellant,
v.
UTAH HOME FIRE INSURANCE COMPANY; Great Atlantic Insurance
Company; Various Underwriters as Their Interests
May Appear in the Term British Market,
Appellants/Cross-Appellees.
Appeal of UTAH HOME FIRE INSURANCE COMPANY, Great Atlantic
Insurance Company, Various Underwriters as Their
Interests May Appear in the Term British
Market, in No. 83-5824.
Appeal of ROBERT T. WINZINGER, INC., in No. 83-5846.
Appeal of EAST COAST TENDER SERVICE, INC., in Nos. 83-5847
and 84-5408.
 Nos. 83-5824, 83-5846, 83-5847 and 84-5408.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 3, 1984.
Decided April 11, 1985.
As Amended April 18, 1985.
 
 William B. McGuire, William J. Prout, Jr. (argued), James T. O'Halloran, Tompkins, McGuire & Wachenfeld, Newark, N.J., Brendan J. Connolly, Mendes & Mount, New York City, for appellants in No. 83-5824.
 Edward V. Cattell, Jr. (argued), Cattell & Keating, Haddonfield, N.J., for appellant in No. 83-5846.
 George J. Koelzer (argued), Clarkson S. Fisher, Jr., Evans, Koelzer, Osborne & Kreizman, Red Bank, N.J., for appellant in Nos. 83-5847 & 84-5408.
 Before ALDISERT, Chief Judge, BECKER, Circuit Judge and CAHN, District Judge*.
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 This litigation arises out of a February 1979 ice storm on the Delaware River at Penns Grove, New Jersey, which damaged two barges that were linked together and used as a pier. The barges were owned by appellee/cross-appellant East Coast Tender Service, Inc. ("East Coast") and were chartered to appellee/cross-appellant Robert T. Winzinger, Inc. ("Winzinger"). Appellants cross-appellees Utah Home Fire Insurance Company, Great Atlantic Insurance Company and various other insurance underwriters ("Underwriters") had issued Hull insurance and Protection and Indemnity ("P & I") insurance on the barges, naming East Coast and Winzinger as insureds, for the period from April 1, 1978, to March 31, 1979. Although the backs of the barges were broken by the storm and they began to sink in the river within the coverage period of these insurance policies, the barges continued to be operated for profit under a state issued license long after the coverage period expired. Ultimately, the barges sank and Winzinger received formal notice to remove them.
 
 
 2
 While a number of issues are presented in these appeals, see infra pp. 282-283, we consider in detail only one of them; whether the Underwriters are liable for the costs of removing the wrecked barges under the wreck removal provisions of the P & I policy that make the Underwriters liable for the costs of wreck removal that is "compulsory by law." The district court denied recovery. Before we reach this question, however, we will set out in more detail the relevant facts and procedural history of the case, and dispose of several preliminary issues.
 
 
 3
 For the reasons that follow, we will affirm the district court's judgment in all its particulars, including its denial of liability for the removal costs, except that we will vacate its award of prejudgment interest for the period from April 1, 1979, until September 30, 1979.
 
 I.
 
 4
 In November 1976, Winzinger chartered and took possession and control of two barges owned by East Coast under a bareboat charter agreement. Winzinger then obtained a license from the New Jersey Department of Environmental Protection ("DEP"), Division of Marine Services, to operate the barges as a temporary loading facility at Penns Grove. The barges were dug into the sand on the river bank and then locked together to form a pier over which large amounts of gravel were conveyed to waiting vessels for transportation to an electric power plant under construction nearby.
 
 
 5
 In February 1979, there was a break in the ice upriver from the barges. A solid wall of ice broke loose, traveled downstream, and struck the barges.[1] The tremendous force of this ice caused one barge to "flop on top" of the other, breaking the backs of both barges.
 
 
 6
 Although the ice storm that damaged the barges occurred in February 1979, and the barges thereafter gradually sank into the river, Winzinger continued to operate the barges as a pier until September 11, 1979, when its contract with the United States Army Corps of Engineers for exclusive use of the Penns Grove property expired. On January 3, 1980, Winzinger cancelled its license with the DEP and, on April 29, 1980, Winzinger received formal notice from the DEP to remove the barges. The sunken barges have not yet been removed.
 
 
 7
 This litigation commenced when East Coast filed suit against Winzinger for failure to pay charter hire after September 30, 1979. Winzinger then sued the Underwriters for a declaratory judgment as to the latter's obligation under the P & I policy to pay for the costs of removing the wrecked barges. Both East Coast and Winzinger asserted claims for compensatory damages against the Underwriters on the ground that, as a result of the ice storm, the barges became constructive total losses in February 1979, when the policy was still in force. They also sought punitive damages, fees, and costs. The Underwriters defended their refusal to honor the claims of East Coast and Winzinger under the policy on several grounds: (1) the barges were not vessels under the general maritime law; (2) the insureds misrepresented the use to which the barges were put, materially affecting the risk that was being underwritten; (3) the damage to the barges resulted from ordinary wear and tear and was not the result of a fortuitous event or a peril of the sea; and (4) the barges did not become constructive total losses.
 
 
 8
 After a trial on the merits, the district court made the following findings with respect to these issues. First, the court found that the barges did not cease to be vessels by reason of their use as a temporary loading pier. According to the court, "[the vessels] were being utilized on only a temporary basis as docks; they had to be seaworthy to be positioned at Penns Grove and to be dismantled as a dock at the conclusion of the operation; and [East Coast] had every intention of chartering them in the future as seaworthy vessels."
 
 
 9
 Second, the court found that neither East Coast nor Winzinger materially misrepresented the nature of the risk or concealed changed circumstances from the Underwriters. According to the court, the insureds communicated the use and purpose to which the barges were being put to their broker, Adams and Porter, Inc., who relayed this information to the Underwriters of the 1976-78 policies.[2] One person they informed was Dale Maple of the American National General Agencies ("ANGA"), the managing general agent of appellant/cross-appellee Utah Home. The court further found that Maple agreed to bind Utah Home, the lead underwriter of the 1978-79 policy, and that Maple was properly apprised of the circumstances when he did so.
 
 
 10
 Finally, the court found that the ice storm that occurred in February 1979 proximately caused the backs of the barges to break, and that the barges were constructive total losses. The court characterized this event as fortuitous and as a peril of the sea. Since damages that flow from fortuitous events are covered under the P & I policy, the court entered judgment in favor of East Coast against the Underwriters for the agreed value of the barges ($110,000), plus prejudgment interest from April 1, 1979 ($83,380.47), and costs to be taxed by the Clerk of the Court.
 
 
 11
 In No. 83-5824, the Underwriters have appealed from the award of damages and interest. We have carefully considered the record and the arguments made by the Underwriters. In connection with the damage award, we conclude that the district court's findings of fact are fully supported by the record and that its application of legal principles was correct. We thus affirm the award of damages for the reasons set forth in the district court's opinion of August 8, 1983.[3]
 
 
 12
 The district court also granted East Coast prejudgment interest at the stipulated rate of 16.69% from April 1, 1979, the approximate date of the loss. The rule in admiralty is that "prejudgment interest should be awarded unless there are exceptional circumstances that would make such an award inequitable." In the Matter of Bankers Trust Co., 658 F.2d 103, 108 (3d Cir.1981). In Bankers Trust, this court noted that prejudgment interest was inappropriate where the party requesting interest has (1) unreasonably delayed in prosecuting its claim; (2) made a bad faith estimate of its damages that precluded settlement; or (3) has not sustained any actual damages. Id. at 108. The district court determined that none of these exceptions was present here. We believe that it did not abuse its discretion in so doing and will therefore affirm the district court's decision to grant prejudgment interest. We will, however, exclude from the calculation of prejudgment interest the period from April 1, 1979, until September 30, 1979, during which time East Coast was receiving charter hire from Winzinger, because to permit prejudgment interest for that period would result in an inequitable double recovery.
 
 
 13
 The district court denied East Coast's claim for punitive damages and attorneys fees. East Coast appeals this denial in No. 83-5847. With respect to punitive damages, the district court found that "the actions of Underwriters in pursuing its defenses prior to or subsequent to the filing of this complaint [were not] especially egregious or in wanton and wilful disregard of [East Coast's] rights" so as to warrant punitive damages. The court also determined that East Coast was not entitled to attorneys fees on the ground that the Underwriters' conduct was neither vexatious nor in bad faith. As these findings are not clearly erroneous and the district court did not abuse its discretion in denying punitive damages and attorneys fees, we affirm in No. 83-5847.
 
 
 14
 The clerk awarded East Coast $3,062.46 of the $13,032.80 in costs that it had requested, and the district court affirmed. East Coast appeals, contending that the clerk should have awarded it greater fees for the testimony of Arthur Sulzer, an expert witness, because Sulzer's testimony was indispensible to the case. We have indeed held that a district court may award more than the statutory witness fee when the expert's testimony is indispensible. See Roberts v. S.S. Kyriakoula D. Lemos, 651 F.2d 201 (3d Cir.1981). However, this theory of recovery was never raised in the district court, and thus we deem it to be waived on appeal. See Tacynec v. City of Philadelphia, 687 F.2d 793, 796 n. 2 (3d Cir.1982) cert. denied, 459 U.S. 1172, 103 S.Ct. 819, 74 L.Ed.2d 1016 (argument raised for first time on appeal will not be considered unless it is of a constitutional magnitude). East Coast did argue in the district court that Sulzer's greater fees, along with fees for a non-expert witness and some attorney travel expenses, should have been awarded because the Underwriters acted in a vexatious manner during the course of the litigation. While it is clear that costs of any nature may be taxed "if the losing party has conducted the case in a vexatious or oppressive manner," Roberts, 651 F.2d at 205, the district court specifically found that the Underwriters' conduct was not vexatious. This finding is supported by the record. In sum, we conclude that the district court did not abuse its discretion in allowing recovery of only a portion of East Coast's costs. We therefore affirm in No. 84-5408.
 
 
 15
 Having disposed of these preliminary issues, we turn now to the difficult question raised by these appeals.
 
 II.
 
 16
 Winzinger seeks a declaratory judgment in No. 83-5846 that wreck removal costs are covered under the P & I insurance policy. The provision of the policy that pertains to wreck removal states:
 
 
 17
 The Assurer hereby undertakes to make good the Assured ... all such loss and/or damage to and/or expense as the Assured shall as owners of the vessel named herein have become liable to pay on account of the liabilities, risks, events and/or happenings herein set forth:
 
 
 18
 ....
 
 
 19
 (7) Liability for cost or expense of, or incidental to the removal of the wreck of the vessel named herein when such removal is compulsory by law ....
 
 
 20
 The difficult question of construction relates to the "compulsory by law" term of the policy.
 
 
 21
 Winzinger contends that it is compelled by law to remove the wrecked barges because the New Jersey trespass and nuisance statutes require removal of sunken barges from state riparian lands. See N.J. Stat. Ann. Secs. 12:3-8. 12:4-5.[4] Winzinger further argues that once it is established that removal is compulsory by law, the Underwriters must indemnify an assured for removal costs arising out of a covered loss for as long as there is a "possible liability." See L. Buglass, Marine Insurance and General Average in the United States 105 (2d ed.1981). According to Winzinger, the breaking of the backs of the barges in the February storm, a covered loss, triggered P & I coverage for wreck removal costs.
 
 
 22
 The district court refused to grant Winzinger declaratory relief because Winzinger "not only has never paid for the removal of these wrecks during the term of the policy, it never demanded or contracted for their removal nor was it ever compelled to remove them during the term of the policy."[5] For reasons set forth below, we affirm the district court's decision denying Winzinger's claim for coverage of removal costs.
 
 
 23
 The cases construing compulsory removal clauses are in conflict. In Seaboard Shipping Corp. v. Jocharanne Tugboat Corp., 461 F.2d 500, 504 (2d Cir.1972), the court held that the term "compulsory by law" specifically required an express order from a governmental body directing removal. On the other hand, in Progress Marine, Inc. v. Foremost Ins. Co., 642 F.2d 816 (5th Cir.1981), cert. denied, 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1982), the Fifth Circuit examined the authorities relied upon by the Jocharanne court, see id. at 819 n. 6, and rejected this interpretation of "compulsory by law" in favor of one that it described as more consonant with the reasonable expectations of the parties. Id. at 820.[6]
 
 
 24
 In Progress Marine, the plaintiff removed the wreck of one of its barges shortly after it capsized and sought to recover the cost of removal from its insurance company. The barge was covered by a P & I policy that contained substantially the same language as the policy at issue in this case. The Fifth Circuit began with the premise that "in construing an insurance policy reference must be made to the reasonable expectations of the parties as to the risks and protection against them." Id. The court concluded that removal is "compulsory by law" when it is "reasonably required by law, [i.e., a legal duty imposed by statute], or where failure to remove ... reasonably expose[s] an insured to liability imposed by law sufficiently great to justify the expense of removal ...." Id. See also Continental Oil Co. v. Bonanza Corp., 706 F.2d 1365, 1372 (5th Cir.1983).[7]
 
 
 25
 We agree with the Fifth Circuit that the phrase "compulsory by law" in the context of this type of insurance policy should not be restricted to situations in which an express order from a governmental body directs removal. Such an interpretation could lead to inequitable results. For example, an owner who removed a vessel in order to avoid a violation of a criminal statute but without specific authorization from a governmental agency would not be able to recover removal costs. See Progress Marine, 642 F.2d at 820. We therefore adopt the Fifth Circuit's more expansive interpretation of the term "compelled by law."
 
 
 26
 This conclusion does not end our analysis, however, since the issue before us is not only whether Winzinger was compelled by law to remove the barges but also when such compulsion to remove must arise with respect to the expiration of the P & I policy term in order for the costs of removal to be covered under that policy. Although neither the Progress Marine nor the Continental Oil courts addressed this issue, the Fifth Circuit's "expectations of the parties" approach, used by that court to interpret the meaning of "compulsion by law," is equally applicable in determining when such compulsion must begin in order for the insureds to recover. Specifically, we hold that the reasonable expectations of the parties under the insurance contract will govern when the legal compulsion to remove must arise. By so holding, we do not foreclose as a matter of law that an insured may recover removal costs even if the legal compulsion arises outside the term of the policy. Thus, an insured whose vessel begins to sink during the evening before his policy expires may well be covered even if a legal obligation to remove the wreck does not arise until later the next morning, after the expiration of the policy. However, there may also be nonliability for compulsory removal within the policy term. For example, if the loss occurs on the first day of a two-year policy and the owner delays removal until the last day, an underwriter may not be required to indemnify its insured.
 
 
 27
 Given the potential for vastly increased costs of removal if delayed, we believe that parties to insurance contracts of the type at issue here normally contemplate that for the insurers to assume the costs of removal, the legal compulsion to remove must arise within a reasonable time after the loss is incurred or, alternatively, within a reasonable time after the expiration of the policy.[8] What constitutes a reasonable time will differ with the circumstances of each particular case. In this case, the ice storm that damaged the two barges occurred in February 1979. The P & I insurance policy on the barges expired on March 31, 1979. Although the barges had ceased to be seaworthy vessels and were therefore constructive total losses after the ice storm broke their backs. Winzinger continued to operate the barges as a pier for profit until September 1979, six months after the expiration of the policy and seven months after the loss. On January 3, 1980, it cancelled its license with the New Jersey DEP, some eleven months after expiration of the policy. It was not until April 29, 1980, that Winzinger received notice from the DEP to remove the barges.
 
 
 28
 Clearly, the barges could not be considered a nuisance under New Jersey law, so as to give rise to a legal obligation to remove, during a time when they were operated in accordance with a state license. Cf. Continental Oil Co. v. Bonanza Corp., 706 F.2d 1365, 1372 (5th Cir.1983) (no present duty to remove the wreck under lease agreement or federal regulations, but only the duty to remove property upon termination of lease). Thus, the earliest that a compulsion to remove existed under New Jersey law was when the license was cancelled. In our view, the obligation to remove, arising at least eleven months after the loss and ten months after the expiration of the policy, came too late for Winzinger to have the reasonable expectations that coverage under the P & I policy would extend to the removal costs. Although the Underwriters may well have expected to indemnify Winzinger for removal costs during the policy term or for a reasonable time thereafter, they could not have anticipated remaining liable for such costs for so long after expiration of the policy. Therefore, the decision of the district court denying Winzinger declaratory judgment will be affirmed.[9]
 
 III. CONCLUSION
 
 29
 In sum, we decide as follows. In No. 83-5824, we will affirm the district court's award of damages and prejudgment interest to East Coast Tender Service, except that we will reverse the court's decision to award prejudgment interest as of April 1, 1979. Instead, prejudgment interest shall be calculated as of October 1, 1979. In No. 83-5847, we will affirm the district court's denial of punitive damages and attorneys fees. In No. 83-5846, we will affirm the district court's decision to deny coverage to Winzinger for the costs of removing the barges. Finally, in No. 84-5408, we will affirm the court's decision to allow recovery of only a portion of East Coast's costs. Each side to bear its own costs.
 
 
 
 *
 Honorable Edward N. Cahn, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 The district court found that between January and March, 1979, the ice conditions in the Delaware River and Bay were the worst in 30 years
 
 
 [2]
 Earlier policies had been issued on the barges by Adams and Porter, Inc. as broker, and certain underwriters, for the period of November 18, 1976, through May 31, 1978
 
 
 [3]
 With respect to the misrepresentation point, we have considered the Underwriter's argument that East Coast owed them a duty of uberrimae fidae, but we find it unpersuasive. Although we agree that in the maritime context a boat owner must meet its duty of uberrimae fidae, we conclude that East Coast's behavior is consistent with the notion of "utmost good faith."
 
 
 [4]
 N.J. Stat. Ann. Sec. 12:3-8 (West 1979) authorizes DEP to commence a civil action "against persons and corporations trespassing upon or occupying the lands of the State under water." N.J. Stat. Ann. Sec. 12:4-5 (West 1979) authorizes the board of chosen freeholders of the county to declare a boat, barge, or scow stranded or sunk in its navigable waters a nuisance and to order removal within 30 days
 
 
 [5]
 The district court also rejected Winzinger's claim for relief on the ground that Winzinger could not recover because of its status. We disagree. As the bare boat charterer of the barges, Winzinger is the owner pro hac vice. Leary v. United States, 14 Wall. 607, 610, 81 U.S. 607, 610, 20 L.Ed. 756 (1872), and may seek limitation of liability as an owner
 
 
 [6]
 In Progress Marine, the court, speaking through Judge Brown, observed that the quoted section of the Jocharanne opinion discussing compulsory removal might be "mere dicta." The court, however, was "unable simply to ignore the fairly unequivocal pronouncement by a distinguished Court so experienced in dealing with marine insurance." Progress Marine, 642 F.2d at 819
 
 
 [7]
 In Continental Oil, Conoco, the time charterer of a vessel that sank beneath an offshore drilling rig, removed the wreck two and a half months after the sinking and sought to recover the cost of removal under a standard P & I policy. 706 F.2d at 1367. The court reaffirmed the standard set forth in Progress Marine but held that Conoco was not compelled by law to remove the wreck because it was not the owner of the vessel but merely a time charterer
 
 
 [8]
 The costs of wreck removal have undoubtedly increased significantly from the time the loss was incurred in February, 1979, and the time that Winzinger terminated the license in January, 1980, since the barges have gradually sunk deeper into the river. Moreover, it might be impossible to reconstruct the costs of removal as of the date of the accident or the date the license was terminated
 
 
 [9]
 We realize that at the time the barges became constructive total losses, Winzinger was faced with a dilemma. It could either invoke the P & I provision and demand that the Underwriters indemnify it for the cost of removing the wrecked barges, or it could continue to operate the barges as a pier and thus honor its contract to remove the sand and gravel at Penns Grove. Winzinger chose to continue to operate and, in doing so, risked losing its right to indemnification under the policy. Although we perceive an injustice in this result, we cannot alter the terms of the policy