**PROGRESS MARINE, INC.,**
**Plaintiff-Appellant,**

v.

**FOREMOST INSURANCE COMPANY,**
**GRAND RAPIDS, MICHIGAN,**
**Defendant-Appellee.**

No. 78–2321.

United States Court of Appeals,
Fifth Circuit.

April 15, 1981.

E. V. Greenwood, Houston, Tex., for plaintiff-appellant.

Brown, Sims & Ayre, Thomas A. Brown, Houston, Tex., for defendant-appellee.

Before BROWN, GEWIN and POLITZ, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

Progress Marine, Inc. (PMI) appeals the District Court's[1] denial of its claim against Foremost Insurance Company (Insurer) for expenses incurred in removing the wreck of a Jackup Workover Barge (PM II) which sank some 11 miles off the Louisiana coast.

---

1. *Progress Marine, Inc. v. Foremost Insurance Co.*, 1979 A.M.C. 70 (S.D.Tex.1978).

PM II was covered by a marine P&I insurance policy which provided recovery for wreck removal expenses when "such removal is compulsory by law." Because we find that the District Court erred in its interpretation of the term "compulsory by law", and accordingly applied an improper legal standard in the resolution of this case, we vacate and remand.

### Eight Fathoms Of Barge In Nine Fathoms Of Water

The essential facts of this case are not in dispute. On the afternoon of June 1, 1975, PMI's Jackup Workover Barge PM II capsized and sank, while being towed, in approximately 56 feet of water some 11 miles off the Louisiana coast. The capsizing and sinking was the result of negligence on the part of the tool pusher and barge captain of the PM II and thus of PMI. In its submerged position, the PM II was located approximately 1500 feet south of a manned Shell Oil production platform and 300 feet southeast of an Exxon Pipeline Company 10-inch high-pressure pipeline. Also in the vicinity were other offshore platforms, pipelines and additional offshore developmental properties.

At the time of this unfortunate incident, the PM II was covered by a standard P&I insurance policy, form SP–38, issued by Insurer. The Protection and Indemnity policy obligated Insurer to reimburse PMI for such sums as PMI shall have become legally liable to pay and shall have paid on account of:

> ... Costs or expenses of, or incidental to, the removal of the wreck of the vessel named herein when such removal is compulsory by law...[2]

After the sinking of the PM II, little time was wasted by PMI in dealing with the situation. First, after considerable effort, PMI was able to rescue five crewmen trapped inside the submerged barge. PMI then pursued, unsuccessfully, various "sue and labor" activities, designed to prevent the barge from becoming a total loss. Finally, on June 10, 1975, PMI notified Insurer that the barge was a constructive total loss and that PMI had abandoned the wreck to Insurer. Insurer, in turn, rejected abandonment.

Unsuccessful in its sue and labor efforts PMI proceeded, on the advice of counsel, to make arrangement's for removing the PM II. On June 20, after receiving various bids, PMI contracted with Sun Salvors on a "No Cure-No Pay" basis to remove the wreck to PMI's premises in Morgan City, Louisiana. By August 21, Sun Salvors had performed the removal and PMI paid over $760,000 under the terms of the contract. In addition to this sum, PMI had incurred an additional $17,529.98 in expenses for wreck removal. PMI was able to recover $127,557 from the sale of the salvaged PM II, yielding a net recovery of $125,977 after deduction of expenses connected with the sale. Accordingly, after deducting these sums, and the $10,000 policy deductible, PMI made demand on Insurer in the total amount of $641,522.98 plus interest and attorneys' fees. This demand was refused by Insurer, although, for purposes of this litigation, Insurer has agreed that the expenses incurred were reasonable.

There is no question that PMI fit the bill of the "prudent company" in removing the PM II. At the time of these activities, hurricane season was approaching and the submerged barge posed a threat to neighboring oil production facilities and workers. In addition, the PM II, once it had settled, lay only eight feet below the surface of the water and posed a threat to navigation in the area, as PMI was clearly informed by the Coast Guard.[3] Nevertheless, Insurer argues that the removal, although perhaps compelled by prudence, was not "compulsory by law" as required by the express terms of the policy. The District Court agreed

---

**2.** The clause continued "... provided, however, that there shall be deducted from such claim, the value of any salvage recovered from the wreck by the assured."

**3.** Four days after the sinking of the PM II, the United States Coast Guard cabled PMI advising that the wreck constituted a hazard to navigation and instructing PMI to properly mark the wreck. *Progress Marine*, 1979 AMC at 71.

with Insurer and denied recovery by PMI. This appeal followed.

### Compulsory By Law?: A Judicial Sounding

The primary task before this Court—the successful resolution of which paves the way for the ultimate decision of the whole case—does not, at first blush, appear to be of Herculean proportions. We are simply asked to determine the meaning of the words "compulsory by law" as they are employed in the P&I policy which Insurer issued and PMI purchased. As simple as this task may initially appear, however, it is probably safe to say that the parties, and the courts, have already devoted more time and effort in resolving the meaning of these three words than was required in the cleaning of all the Augean stables.

At the outset, we emphasize that whether we employ California law, as PMI suggests may be required by *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337, 1955 A.M.C. 467 (1955),[4] or some other law is not particularly material to the resolution of this issue since there is no indication that land-based insurance principles concerning the construction of insurance policies vary significantly from marine principles. See *Calcasieu-Marine Nat. Bank, Etc. v. Am. Emp. Ins.*, 533 F.2d 290, 295 (5th Cir. 1976). A review of some of these principles provides us with buoys for interpreting this policy.

In *Calcasieu-Marine* this Court recognized these general principles:

> [W]ords are to be construed in their plain, ordinary, and popular sense. [Citations omitted]. This rule is varied from only if a word is used as a 'term of art', in which case its meaning in the area for which it is a term of art is applied.

*Id.*, 533 F.2d at 295–96.

This Court further reiterated in *Walter v. Marine Office of America*, 537 F.2d 89, 95, 1977 A.M.C. 1471, 1477–78 (5th Cir. 1976) what we had many times pronounced:

Considering that a reviewing Court should view a contract in the light of the setting of the parties and the reasonable expectations as to risks and protection against them, an insurance policy should be construed in such a way as to effectuate its purpose.

Finally, it is a well established insurance law principle that the "insurance policy if uncertain in meaning should be construed against the insurer who wrote it and should be read liberally so as to indemnify the insured." *Id.*, 537 F.2d at 94–95, 1977 A.M.C. at 1477; see also *Calcasieu-Marine*, 533 F.2d at 295.

This Court has never had occasion to address the precise question raised by this case. Prior to launching into an independent analysis of the meaning of the term "compulsory by law", however, we deem it appropriate to briefly discuss decisions of other courts on this point.

The Second Circuit has authored an opinion as to the purport of a policy insuring against "costs or charges of raising or removing the wreck of the ship named herein when such removal is compulsory." This is certainly a close cousin of the policy in our case, if not an identical twin. In *Seaboard Shipping Corporation v. Jocharanne Tugboat Corporation*, 461 F.2d 500, 504, 1972 A.M.C. 2151, 2154 (2d Cir. 1972) that Court declared in awesome terms:

> '[C]ompulsory removal' is a term of art in admiralty law and refers to a situation in which a hull has been abandoned by the owner and the hull underwriter but, *pursuant to government order*, must be removed from navigable waters. Under those circumstances, the P&I underwriter, absorbing costs which no one else remains liable to pay, must remove the wreck or reimburse the government for removal. (Emphasis added).

District Courts in our own Circuit are evidently split in their interpretation of the

---

4. The insurance policy was apparently issued in California. The parties themselves do not consider the choice of law question to be a significant issue in this case. To the extent that *Wilburn Boat* does require the application of California law, we find the general principles of construction which we rely on in this case to be consistent with the law of that state.

meaning of removal "compulsory by law" in a marine insurance policy. The District Court in the instant case, although not citing *Jocharanne*, made findings seemingly consistent with the Second Circuit opinion. While stating that Insurer admitted that under the circumstances the wreck removal was prudent, and that the capsized PM II constituted a hazard to navigation, the District Court in concluding that the removal was not "compulsory by law" found that "at no time prior to its actual removal by plaintiff, did the United States Corps of Engineers, any other governmental body, or any court of competent jurisdiction order plaintiff to remove" the wreck. 1979 A.M.C. at 72–73. The Court further found that no governmental body had authority to order removal of the wreck. *Id.* at 73.

In a more recent opinion, another District Court in this Circuit reached a conclusion apparently at odds with *Jocharanne* and the District Court opinion in this case. In *Continental Oil Co. v. Bonanza Corporation*, —— A.M.C. —— (S.D.Tex.1980) [H–78–944, Aug. 25, 1980], the charterer of a vessel, which sank alongside an offshore rig, removed the wreck and then sought reimbursement from the insurer. In permitting direct action against, and ultimately recovery from, the insurer, Judge Cire found:

> The policy contains a provision requiring the payment of wreck removal expenses, as here, when such removal is compulsory by law. [Insurer] points to the decisions of [*Jocharanne*] and [*Progress Marine*] as standing for the proposition that removal is 'compulsory by law' only where written demand has been made by a governmental authority. But such a restrictive interpretation of the language is unjustified.

Although the Court in *Bonanza* did not articulate an interpretation as to the precise meaning of the term "compulsory by law", the Court clearly backed away from the notion that removal must be made pursuant to direct governmental order in order to warrant recovery.

As discussed previously, were we to conclude, as *Jocharanne* clearly suggests, that "compulsory by law" is a term of art in the marine insurance business, our initial inquiry would be at an end. We would simply apply the term of art meaning and conclude, as the Second Circuit stated, that removal must be specifically ordered by a governmental body to warrant coverage. Although we incline strongly to agree with PMI that the quoted section of the *Jocharanne* opinion which discusses compulsory removal is mere dicta,[5] we are unable simply to ignore the fairly unequivocal pronouncement by a distinguished Court so experienced in dealing with marine insurance. However, upon independent examination of the authorities cited in *Jocharanne*[6] we are unable to agree with that Court that removal "compulsory by law" requires a peremptory order by an authoritative governmental agency.

Stripped of reliance on "compulsory by law" imposed by widely accepted maritime law as a term of art we must, as previously discussed, try to construe these words in their "plain, ordinary, and popular sense." *Calcasieu-Marine*, 533 F.2d at 295–96. Although these three words in and of themselves do not appear particularly inscrutable, in the lexicon of marine insurance we find resort to the dictionary to be useful, and find Black's Law Dictionary (4th ed.) particularly helpful.

Taking first the word "compulsory" *Black's* provides the following definition:
> Involuntary; forced; coerced by legal process or by force of statute.

For the word "by" *Black's* provides the following definition:

---

**5.** The vessel in *Jocharanne* was removed as part of "sue and labor" activities. The vessel owner never attempted abandonment but rather had the vessel removed for the sole purpose of salvaging the hull. The "compulsory removal" provision of the insurance policy, therefore, never came into play. 461 F.2d at 504, 1972 A.M.C. at 2154.

**6.** At 461 F.2d at 504, 1972 A.M.C. at 2154, appears the following citation of authorities:
> *See* the Wreck Removal Act, 33 U.S.C. §§ 409–414; Dover, A Handbook to Marine Insurance (6th ed. 1964) at 439. *Cf. Wyandotte Transportation Co. v. United States*, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967).

In consequence of ... through the means, act, agency or instrumentality of. Finally, *Black's* defines "law" as:

That which is laid down, ordained, or established. A rule or method according to which phenomena or actions co-exist or follow each other. That which must be obeyed and followed by citizens, subject to sanctions or legal consequences, is a 'law'.

Viewing these three words together as a phrase, it seems evident that "compulsory by law" in the context of this insurance policy should not be viewed as restricted to situations in which an express direct order from a governmental body directs removal. Clearly, for example, removal occasioned to avoid a violation of a criminal statute subject to criminal sanctions, although not specifically ordered by governmental authority, would nevertheless be compelled by law. On the other hand we are not prepared to say that removal occasioned by *any* "legal obligation" is "compulsory by law", as PMI would seem to suggest.[7]

Soundings Reveal: Risk Evaluation

As stated in *Walter*, 537 F.2d at 95, 1977 A.M.C. at 1477–78, in construing an insurance policy reference must be made to the reasonable expectations of the parties as to the risks and protection against them. As applied to this case, removal occasioned by an unarticulated or unreasonable apprehension of criminal or civil liability could not be considered "compelled by law". On the other hand, where removal was reasonably required by law, or where failure to remove would have reasonable exposed an insured to liability imposed by law sufficiently great to justify the expense of removal, then, we believe, such removal could be considered "compelled by law" for purposes of recovery. However, an additional inquiry must be made as to whether the removal was in fact "compelled by law," that is, whether removal was performed as a result of a subjective belief on the part of the insured that such was reasonably necessary to avoid legal consequences of the type contemplated by this policy.[8]

While we do not pass final judgment on this case, nor make a forecast as to the ultimate judgment of the District Court on remand, we believe that on the facts presently before the Court it at least cannot be said that no possibility for recovery by PMI exists under the legal standard which we have announced. Certainly, for example, potential exposure to PMI resulting from its wreck rupturing an oil pipeline or breaching the hull of an oil carrying vessel could have been enormous. Although we do not undertake to address the reasonable probabilities of the occurrence of these or similar casualties, we nevertheless raise

---

**7.** As authority for the proposition that removal "compulsory by law" connotes any removal performed pursuant to a "legal obligation" PMI refers us to L. Buglass, Marine Insurance and General Average in the United States (1973), pp. 64–65:

> Protection and Indemnity underwriters do cover wreck removal expenses but it must be emphasized that, absent any specific agreement to the contrary, underwriters insuring wreck removal expenses are only liable if their assured is *legally liable* for removing the wreck. Under such Protection and Indemnity coverage the assured usually remains protected and indemnified for as long as he has a possible liability. Thus, if the insured vessel sinks as a result of the original accident and the wreck cannot be located but resurfaces at a later date, any *legal liability* falling on the assured to remove the wreck is covered by the original insurance. (Emphasis the author's).

While Buglass may correctly state a general proposition concerning insurance for wreck removal, we are disinclined to rely on this authority in resolving the present controversy. It is certainly arguable that the inclusion of the words "compulsory by law" in the insurance policy before us was reasonably intended, and reasonably understood, to restrict recovery to cases where something more than simple exposure to "legal liability" exists.

**8.** This "objective" and "subjective" inquiry which we deem appropriate in this case is akin to the dual inquiry as to the availability of "good faith" immunity in certain actions under 42 U.S.C. § 1983. *Cf. Wood v. Strickland*, 420 U.S. 308, 321, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975); *Dilmore v. Stubbs*, 636 F.2d 966 (5th Cir. 1981); *Bryan v. Jones*, 530 F.2d 1210, 1214 (5th Cir.) (En Banc), *cert. denied*, 429 U.S. 865, 97 S.Ct. 174, 50 L.Ed.2d 145 (1976).

here several points of liability which such casualties could have engendered.

We note that at the time of the sinking of the PM II, the Federal Water Pollution Control Act of 1972, 33 U.S.C. § 1321,[9] prohibited the discharge of oil into or upon waters adjoining the United States at least within twelve miles from shore.[10] This Act expressly provided for third party liability to the United States Government, in certain circumstances, for oil spill removal costs. *Id.*, at § 1321(g). Furthermore, PMI would have been without resort to any available limitation if it could have been shown that the oil discharge "was the result of willful negligence or willful misconduct within the privity and knowledge of [PMI]." *Id.* We raise, without addressing, the potential relevance of the fact that legislation enacted after the 1975 sinking of the PM II imposes increased statutory liability for oil spills. See, e.g., the Clean Water Act of 1977, 33 U.S.C. § 1321.

In addition to this statutory liability to the United States, in the event of a major oil spill caused by its negligence PMI also could have potentially faced enormous damages under private actions for pollution damage. For these claims, even if PMI could have established that the PM II was a "vessel" entitling PMI to limitation under the Limitation of Liability Act of 1851, 46 U.S.C. §§ 181 *et seq.*, it is quite possible that PMI still could not have successfully invoked limitation for the sinking of the PM II. And in any event, its liability in these possible risk situations would have been for failure to remove the wreck which might constitute personal fault within the privity and knowledge of the owner. See, e.g., *University of Texas Medical Branch at Galveston v. United States*, 557 F.2d 438, 448, 1977 A.M.C. 2607, 2618–19, and cases discussed in n.13 (5th Cir. 1977).

**Hauling The Dispute Back To Port**

Since the District Court's opinion was rendered in the light of an interpretation of the controlling language in the insurance policy which was erroneous, we cannot credit the findings of the Court as presently made. See *Kirksey v. City of Jackson, Mississippi*, 625 F.2d 21, 21–22 (5th Cir. 1980); *NLRB v. Alterman Transport Lines*, 587 F.2d 212, 220 (5th Cir. 1979); *Theriault v. Silber*, 547 F.2d 1279, 1280 (5th Cir.), *cert. denied*, 434 U.S. 871, 98 S.Ct. 216, 54 L.Ed.2d 150 (1977); *Costello v. Lipsitz*, 547 F.2d 1267, 1276–77 (5th Cir.), *cert. denied*, 434 U.S. 829, 98 S.Ct. 109, 54 L.Ed.2d 88 (1977). We similarly do not pass on the Court's legal finding that no governmental authority was empowered to order removal of the wreck of the PM II sunk 11 miles off the Louisiana coast since this finding, even if true, is not necessarily dispositive of the case. We reiterate that by our observations concerning potential liability to PMI for failure to remove the wreck we make no intimations as to the ultimate disposition of this case. We remand this action in full to the District Court to make the dual inquiry described in this opinion, leaving initially to the parties and the District Court to determine the extent to which the present record should or need be supplemented.

VACATED and REMANDED.

9. The FWPCA has been amended by the Clean Water Act of 1977, 33 U.S.C. § 1321. The complete text of the FWPCA may be found in 3 Benedict on Admiralty (7th ed. 1975), 9–23—9–40.3.

10. The actual language of the Act proscribes discharge of oil into or upon "waters of the contiguous zone." 33 U.S.C. § 1321(b)(1). The contiguous zone was contemplated as extending 12 miles from the coast of the United States. See § 1321(a)(9) together with 37 Fed. Reg. 11906 (1972); see also 3 *Benedict on Admiralty* at 9–11, n.10.