ZURICH INSURANCE
COMPANY Plaintiff

v.

Ronald Malcom PATEMAN, et
al., Defendants.

Civ. A. No. 86–596.

United States District Court,
D. New Jersey.

Oct. 27, 1987.

Amended Opinion Aug. 9, 1988.

Hill, Rivkins, Carey, Loesberg, O'Brien &
Mulroy, Newark, N.J., for plaintiff.

Tompkins, McGuire & Wachenfeld, Newark, N.J., for defendants.

AMENDED OPINION

LECHNER, District Judge.

This is an admiralty case involving a
dispute as to which marine underwriter is

liable to pay the costs of removing the F.V. LIBERTY, a fishing boat which capsized and sank in the Manasquan Inlet. Plaintiff Zurich Insurance Company ("Zurich") claims the costs of removing the vessel are covered under the "protection and indemnity" provisions of the insurance policy. Defendants, various syndicates at Lloyds of London, claim the costs of removal are covered under the "sue and labor" and/or salvage provisions of the insurance policy. Which provision covers the loss determines the respective amounts of money which the parties are required to pay. The parties have consented to the submission of this case for trial on stipulated facts.

*Facts* [1]

*Insurance Coverage*

Zurich issued a marine insurance policy (No. OM71–53–069) to the Liberty Fishing Corporation ("Liberty Fishing"), the owners of the fishing vessel F.V. LIBERTY. This policy included hull and machinery coverage in the amount of $350,000.00 (the "hull coverage") and protection and indemnity ("P & I") coverage with a combined single limit of $100,000.00 for each occurrence (the "P & I coverage").

The hull coverage ensured the F.V. LIBERTY, her hull, tackle, apparel, engines, boilers, machinery, appurtenances, equipment, stores, boats and furniture. The relevant part of the policy is as follows:

> In case of any loss or misfortune it shall be lawful and necessary for the assured, their factors, servants and assigns, to *sue, labor and travel* for, in and about the defense, safeguard and recovery of the vessel named herein, or any part thereof, without prejudice to this insurance, to the charges whereof this Company will contribute as hereinafter provided. It is agreed that the acts of the assured or this Company, or their agents, in recovering, saving and preserving the property insured in case of disaster shall not be considered a waiver or an acceptance of an abandonment, nor as affirming or denying any liability under this policy; but such acts shall be

considered as done for the benefit of all concerned, and without prejudice to the rights of either party

.        .        .        .        .

> In the event of expenditure under the sue and labor clause, this Company will pay the proportion of such expenses that the amount insured hereunder bears to the agreed valuation of the vessel named herein, or that the amount insured hereunder, less loss and/or damage payable under this policy, bears to the actual value of the salved vessel, whichever proportion shall be less.

.        .        .        .        .

> No recovery for a constructive total loss shall be had hereunder unless the expense of recovering and repairing the vessel named herein shall exceed the agreed valuation.

> In ascertaining whether the vessel named herein is a constructive total loss the agreed valuation shall be taken as the repaired value, and nothing in respect of the damages or break-up value of the vessel or wreck shall be taken into account.

(emphasis added.)

The relevant provisions of the P & I coverage provide as follows:

> In consideration of the premium and subject to the warranties, terms and conditions herein mentioned, this Company hereby undertakes to pay up to the amount hereby insured and in conformity with lines 5 and 6 hereof, such sums as the assured, as owner of the "LIBERTY" shall have become legally liable to pay and shall have paid on account of:

>> Loss of life, or injury to, or illness of, any person;

>> Hospital, medical, or other expenses necessarily and reasonably incurred in respect of loss of life of, injury to, or illness of any member of the crew of the vessel named herein;

---

**1.** Unless otherwise noted, the facts are taken from the statement of stipulated facts submitted in this matter and consented to by the parties. Jurisdiction is based upon 28 U.S.C. § 1333.

Loss of, or damage to, or expense in connection with any fixed or movable object or property of whatever nature; *Costs or expenses of, or incidental to, the removal of the wreck of the vessel named herein when such removal is compulsory by law;* provided, however, that there shall be deducted from such claim the value of any salvage recovered from the wreck by the assured;

Fines and penalties, including expenses reasonably incurred in attempting to obtain the remission or mitigation of same, for the violation of any of the laws of the United States, or of any state thereof, or of any foreign country; provided, however, that this Company shall not be liable to indemnify the assured against any such fines or penalties resulting directly or indirectly from the failure, negligent, or default of the assured or his managing officers to exercise the highest degree of diligence to prevent a violation of any such laws;

Costs and expenses, incurred with this Company's approval, of investigating and/or defending any claim or suit against the assured arising out of a liability or an alleged liability of the assured covered by this policy.

(emphasis added).

The defendants, Ronald Malcom Pateman, *et al.* ("Excess P & I") are various syndicates at Lloyds of London who agreed to insure Liberty Fishing for P & I coverage in excess of the $100,000 P & I limit insured by Zurich. Commercial Marine & Insurance Specialists of Florida, acting on behalf of the owners of the F.V. LIBERTY, or their placing brokers, bound excess insurance in three layers in London.[2] There were three covernotes providing the excess protection and indemnity insurance.

Covernote AL–0105 provided up to $100,000 in coverage for any one accident in excess of the $100,000 Zurich coverage. Covernote LH–1341 provided up to $800,000 in coverage for any one accident in excess of Zurich $100,000 coverage plus the covernote A–0105 $100,000 coverage. Covernote H–3183 provided up to $4,000,000 in coverage for any one accident in excess of the $100,000 Zurich coverage plus the $100,000 covernote AL–0105 coverage plus the $800,000 LH–1341 coverage. The validity of the insurance policies reflected in all of the covernotes is not disputed. The parties have agreed that the underlying or primary carrier referred to in all of the covernotes is Zurich.

*The Incident*

On December 12, 1981 the F.V. LIBERTY, an eighty-two foot steel hulled fishing vessel, capsized and sank while attempting to enter the Manasquan Inlet along the coast of New Jersey. This area of the inlet is bordered by two stone jetties and has a width of one hundred twenty five feet. The United States Coast Guard ("USCG") arrived at the scene and rescued a number of the crew; some of the crew died.

After the casualty, the USCG in Sandy Hook began transmitting a Safety Message Broadcast which stated in part:

Salvage operations are ongoing on the F.V. Liberty which is capsized on the south side of Manasquan Inlet. A tug, barge, and many small craft are working in the immediate vicinity. The inlet is partially blocked and all mariners are required to transit the area at slow speed and with extreme caution.

Shortly after the F.V. LIBERTY sank, a Mr. Dick Williams of Liberty Fishing contacted the USCG station at Manasquan, New Jersey. The USCG issued SITREP (situation report) Two concerning the conversation with Williams. This report stated: "Advised Mr. Williams of his responsibility concerning poll, marking wreck, salvage, property damage."

The Insurance Adjustment Bureau ("IAB") appointed Captain Charles Dodd, a marine surveyor from Avon-by-the-Sea, New Jersey, to attend on the scene. "IAB also appointed Messrs. Standard, Weisberg, Heckerling & Roscow, P.C. [a law firm]

---

2. For a description of how insurance is bound at Lloyds of London, see *Edinburgh Assur. Co. v.* *R.L. Burns Corp.,* 479 F.Supp. 138, 144–46 (C.D. Cal.1979).

("Standard, Weisberg") to protect the interests of the Excess P & I and the primary P & I." [3] (Stip. 20) In addition, IAB appointed U.S. P & I, a marine survey firm, to attend the United States Coast Guard hearings and to investigate the P & I claims in general.

On December 12, 1987, Caldwell Diving Service ("Caldwell") began work to remove the F.V. LIBERTY from the inlet. The USCG station in Sandy Hook notified the Corps of Engineers of the capsized vessel. On December 13, 1983, the Commanding Officer of the United States Coast Guard station at Manasquan Inlet forwarded a letter to IAB which stated in part:

On 13 December 1983, the day after the fishing vessel LIBERTY capsized in Manasquan Inlet, I briefed Mr. Charles Dodd your Supervisor of Salvage on this case of the owners or their agents responsibilities under the law. Under Title 33 Code of Federal Regulations parts 64 and 153 and 33 U.S.Code 403 the owner is responsible to mark the wreck has [sic] a hazard to navigation, and then to remove the wreck from that channel and restore that channel for safe navigation. In addition, the owner is responsible for preventing a oil pollution discharge from occuring and if one occurs, he is responsible for the clean up.

On December 19, 1983 F.V. LIBERTY was righted. At this time, a Mr. Wojay of the Army Corps of Engineers advised Captain Dodd that he wanted the inlet dragged before Caldwell left the scene. On or about December 20, 1983, the initial Safety Message Broadcast was cancelled and a new USCG broadcast stated in part:

Salvage operations on the remaining debris from the F.V. Liberty hull begins [sic] today ... the Tug AKELA will be dragging the inlet for debris....

On December 20, 1983 Caldwell completed removal of the F.V. LIBERTY and submitted a bill for $119,891.15.

On or about December 20, 1983, the Coast Guard issued SITREP SIX which stated in relevant part:

F/V Liberty is righted and dewatered. VSL has been moved from MQ Inlet south sea wall and is no longer hazard to NAV.

"On January 23, 1984, Mr. Henry Cerco of IAB, acting on behalf of Zurich, notified Messrs. Standard, Weisberg, the attorneys acting for Excess P & I," (Stip. 27) as follows:

As I advised you, we have now received the bill for the wreck removed in the amount of $119,981.15. As you know, wreck removal comes under the P & I Policy. In this instance, our insurer, Zurich has $100,000 primary coverage.

Please note that Captain Stapleton of United States P & I Agency in New York has been sending me various medical bills for treatment of the crew members who were aboard the vessel at the time of sinking. None of the bills have been paid to date because we were of the opinion that it would be easier to tender the limits of the primary carrier to the excess carrier. Please advise whether you wish us to pay a portion (up to $100,000 of the wreck removal invoice or to tender our limits. We will await your direction.

(Plaintiff's Exhibit 2.)

On January 31, 1984, Captain J.R. Stapleton of U.S. P & I advised IAB in relevant part:

Since your P & I policy normally covers wreck removal, I would estimate this, combined with the above, will far exceed your policy limits. Therefore, you may wish to tend [sic] the policy limits to the excess carrier and close your file.

A copy of this letter was forwarded to Standard, Weisberg.

On February 2, 1984, Standard, Weisberg, apparently on behalf of Excess P & I, advised Mr. Cerco by telex as follows:

THIS WILL CONFIRM OUR PHONE CONVERSATION WHEREIN WE ADVISED YOU THAT THE UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO THE EXCESS P AND I INSURANCE ISSUED TO LIBERTY

---

**3.** The primary P & I is Zurich.

FISHING CORPORATION DISCLAIM ANY AND ALL LIABILITY OR RESPONSIBILITY FOR THE COST OF RAISING AND REMOVING THE F/V "LIBERTY".

UNDERWRITERS' POSITION IS THAT COMPULSORY REMOVAL REFERS TO A SITUATION IN WHICH A HULL HAS BEEN ABANDONED BY THE OWNER AND ITS HULL UNDERWRITERS ONLY AFTER A TOTAL LOSS HAS BEEN DECLARED AND IS REQUIRED PURSUANT TO GOVERNMENT ORDER. THE SALVAGING OF THE "LIBERTY" DOES NOT MEET THIS CRITERIA.

IT IS UNDERWRITERS' POSITION THAT THE REMOVAL OF THE LIBERTY IN THIS MATTER FALLS WITHIN EITHER THE SUE AND LABOR OR SALVAGE PORTIONS OF THE HULL POLICY AND SHOULD BE FOR HULL UNDERWRITERS' ACCOUNT.

WE REMIND YOU THAT IN ORDER TO TAKE ADVANTAGE OF THE 10 0/0 SAVING, THAT PAYMENT MUST BE MADE TO CALDWELL BY FRIDAY, FEBRUARY 3.

(Stip. 29.)

"On April 27, 1984, Standard, Weisberg, acting on behalf of primary [4] and Excess P & I underwriters, filed a petition for limitation of liability in the United States District Court for the District of New Jersey." (Stip. 31.) They also filed an affidavit of value, which stated that the value of the F.V. LIBERTY was $39,400.

When F.V. LIBERTY was righted, it was found to have lost its entire superstructure. Captain Dodd noted in his log with respect to the vessel, ". . . it is a disaster". Captain Dodd later solicited bids for the sale of the vessel on an "as is, where is" basis. Bids were also solicited on behalf of the hull underwriter, for the cost of restoring the vessel. On February 22, 1984, the owners of the F.V. LIBERTY tendered the abandonment of the vessel. The hull of the F.V. LIBERTY was eventually sold by Liberty Fishing to Atlantic Marine Diesel Services for $25,000.

The parties to this action agree the amount charged by Caldwell for removing the vessel is reasonable. They also agree Zurich paid that amount to Caldwell on August 13, 1984, with the consent of the Excess P & I and with the Excess P & I agreement that payment of this amount was without prejudice to Zurich's assertion that the cost of removal is properly payable by Excess P & I.

Zurich tendered its protection and indemnity coverage of $100,000 to the Excess P & I. The parties agree if the costs of removing the vessel are held to be a P & I expense, Excess P & I is liable to pay $119,891.15 to Zurich, less the $25,000 proceeds of the sale of the wreck, for an amount due to Zurich of $94,891.15. Zurich also seeks both prejudgment interest and the costs of this action.

*Discussion*

The sole issue to be decided in this case is whether the costs of removing the sunken F.V. LIBERTY are covered by the "sue and labor" and/or salvage provisions of the hull coverage or whether the costs are covered under the P & I coverage.

A. *The Sue and Labor Clause*

■ The "sue and labor" clause of a marine insurance policy is an ancient component of the policy which allows the insured to recover for labor and expenses incurred in order to prevent a loss for which the underwriters would be responsible. *See American Merchant Marine Insurance Co. v. Liberty Sand & Gravel Co.*, 282 F. 514, 520 (3d Cir.) *cert. denied*, 260 U.S. 737, 43 S.Ct. 96, 67 L.Ed. 489 (1922). Under this provision the underwriter is liable for all costs expended by the insured in preventing or ameliorating a loss which the underwriter would be required to pay. *Id.*

The terms of the "sue and labor" provision involved in this case are not determinative of whether the costs of removing the F.V. LIBERTY are recoverable under the

---

**4.** Presumably Zurich.

sue and labor provision or the P & I policy. The purpose of a hull policy is to insure the hull of the vessel and its gear. *M.J. Rudolf Corp. v. Lumber Mutual Fire Insurance Co.*, 371 F.Supp. 1325, 1327 (E.D.N.Y. 1974). It does not appear this policy was intended to cover the costs of removing a wreck when such removal was required by law. *See id.*

If the removal of the sunken F.V. LIBERTY was undertaken in order to preserve the ship's hull, gear and personalty, then the removal would be covered by the sue and labor provision of the hull policy. Removal for this purpose would be an effort to prevent additional losses to the hull for which Zurich would be liable.

■ The Excess P & I has introduced deposition testimony of various parties involved in the removal of the sunken F.V. LIBERTY. The Excess P & I attempts to use this testimony to show the removal was undertaken in order to prevent further damage to the hull of the vessel and mitigate Zurich's liability to its insured. None of this testimony clearly shows that the removal was undertaken for this purpose.

An objective review of the facts reveals the F.V. LIBERTY sank in the narrow channel which formed the Manasquan Inlet. It rendered a portion of that channel unnavigable. Moreover, the Coast Guard advised Mr. Dick Williams, of Liberty Fishing, the owner of the sunken vessel, "of his responsibility concerning hull, marking wreck, salvage, [and] property damage." (See U.S. Coast Guard SITREP Two, Exhibit E to the Stipulation of Facts.) In this regard, the commanding officer of the United States Coast Guard station at the Manasquan Inlet forwarded a letter to IAB advising of the requirements placed upon the owners of the vessel or their agents to mark the wreck as a hazard to navigation, to remove the wreck from the channel and to restore the channel for safe navigation. (See Stip. 21 and Exhibit F thereto.) It is not unreasonable to say that this correspondence is the functional equivalent of a governmental order to the owners of the vessel or their agent.

In addition, at the time the salvage party sent a diver down to inspect the capsized F.V. LIBERTY, it appeared the vessel was a total loss or a constructive total loss. Although Excess P & I argue the conduct of Zurich, through its agents, indicates a desire of Zurich to refloat and reconstruct the vessel in order to mitigate its monetary liability on the hull coverage, a review of the entire situation suggests this was a secondary, if not tertiary intent of Zurich and its agent effecting the removal of the wreck from the channel.

The fact that Zurich, through its agent, solicited bids to restore the vessel subsequent to the removal of the vessel is nothing other than an attempt to mitigate Zurich's liability. Nevertheless, the fact remains the vessel, at the time it was capsized on the floor of the channel of the Manasquan Inlet, was a constructive total loss. It cannot be said the purpose of the removal was the preservation of the hull and its gear.

This situation is distinct from the factual context presented to the Second Circuit in *Seaboard Shipping Corporation v. Jocharanne Tugboat Corporation,* 461 F.2d 500 (2d Cir.1972) where the vessel was removed as part of the "sue and labor" activities. In that case, the owner of the vessel sought removal of the vessel for the sole purpose of salvaging the hull. Therefore, the "compulsory removal" provision of the insurance policy was not triggered. Although the "sue and labor" expenses in a hull policy are in addition to the agreed value of the hull, *Seaboard Shipping,* 461 F.2d at 503, they do not come into play in this case.

■ Defendants argue "that in the instant case no attempt was made to involve the protection and indemnity insurers, especially the Excess Protection and Indemnity insurer, until the January 23, 1984 letter from Henry C. Cerco to Lewis Herman, Esq.....'' (Excess P & I Memorandum of Law at 16.) Although this came one month after removal of the vessel from the floor of the channel, the delay in and of itself is of no moment. The action to remove the vessel from the floor of the channel could

not be undertaken in leisure. The initial safety message broadcast from the United States Coast Guard indicated the positioning of the F.V. LIBERTY on the southside of the Manasquan Inlet, the fact the Inlet was partially blocked, and the need to transit the area with extreme caution. A speedy removal was required not only to mitigate any future liability but also to return the channel to full use. Clearly, the primary and significant purpose in the removal of the wreck from the floor of the channel was not salvage per se, albeit these considerations appear to have been part of Zurich's thinking subsequent to removal, but removal of a hazard on the floor of the channel.

As noted, two days after the capsizing and sinking of the F.V. LIBERTY, a diver found the superstructure of the vessel to be broken and its pilothouse crushed. (See Plaintiff's Exhibit 5.) Prior to removal of the vessel, Zurich had no other information as to the condition of the vessel. Captain Charles Dodd, the marine surveyor appointed by IAB to attend the scene, understood the vessel was a constructive total loss. (Exhibit G, p. 20; pp. 39–40.) There is nothing to suggest, or indeed support a finding, that prior to the removal of the vessel Zurich was raising the vessel to enable it to restore rather than to remove the vessel from the scene.

### B. *The P & I Coverage*

The P & I Coverage involved in this case covers the costs of wreck removal "when such removal is compulsory by law." The Third Circuit has indicated that the term "compulsory by law" in a maritime P & I Policy should be interpreted according to the reasonable expectation of the parties. *East Coast Tender Service v. Winzinger*, 759 F.2d 280 (3d Cir.1985).

In *East Coast Tender*, the Circuit adopted the following standard:

"in construing an insurance policy reference must be made to the reasonable expectations of the parties as to the risks and protection against them." ... removal is "compulsory by law" when it is "reasonably required by law, [*i.e.*, a legal

duty imposed by statute], or where failure to remove ... reasonably expose[s] an insured to liability imposed by law sufficiently great to justify the expense of removal."

(citations omitted), 759 F.2d at 286 (quoting *Progress Marine, Inc. v. Foremost Insurance Co.*, 642 F.2d 816, 820 (5th Cir.), *cert. denied*, 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981)).

The decision in *East Coast Tender* adopted the interpretation of "compelled by law" set forth in *Progress Marine*, 642 F.2d at 816. In that case a barge capsized and sank off the coast of Louisiana due to the negligence of its owner. *Id.* at 817. The barge was covered by a standard P & I policy which was almost identical to the one involved in this case. Immediately after the sinking the owner pursued various "sue and labor" activities in an effort to prevent the barge from becoming a constructive total loss. These efforts were unsuccessful. *Id.*

Because the hurricane season was approaching, the barge presented a threat to the surrounding oil production facilities and workers. In addition, the barge posed a threat to navigation because it came to rest only eight feet below the surface of the water. *Id.* This threat to navigation was evidenced by the fact that the Coast Guard advised the owner that the wreck constituted a hazard to navigation and instructed the owner of his duty to properly mark the wreck. *Id.* at 817, n. 3.

The *Progress Marine* court proceeded to adopt the reasonable expectations of the parties standard for interpreting the phrase "compulsory by law." Although the Fifth Circuit did not specifically hold the removal of the barge was compelled by law, it was suggested such a finding was likely.

As applied to this case, removal occasioned by an unarticulated or unreasonable apprehension of criminal or civil liability could not be considered "compelled by law". On the other hand, where removal was reasonably required by law, or where failure to remove would have reasonable [sic] exposed an insured to

liability imposed by law sufficiently great to justify the expense of removal, then, we believe, such removal could be considered "compelled by law" for purposes of recovery.

*Id.* at 820. The court noted the owner could have been exposed to enormous liability if the wreck had damaged an oil pipeline or breached the hull of an oil carrying vessel. *Id.* at 820.

In this case the removal of the F.V. LIBERTY from the Manasquan Inlet meets the *Progress Marine/East Coast Tender* standard. Even without the Coast Guard directive to remove the wreck from the channel and restore the channel to navigability, the owners of F.V. LIBERTY and/or their agents, the insurers, could have, and in this case did, reasonably conclude the failure to remove the wreck would expose them to liability in an amount "sufficiently great to justify the expense of removal." *Progress Marine*, 642 F.2d at 820. As in *Progress Marine* where the owner "fit the bill" of a prudent company in removing the barge so too did Zurich, as the agent of the owner of the F.V. LIBERTY, act as the "prudent company" in removing the vessel.

> At the time of [the removal] activities, hurricane season was approaching and the submerged barge posed a threat to neighboring oil production facilities and workers. In addition, the [barge], once it had settled, lay only eight feet beneath the surface of the water and posed a threat to navigation in the area, as [the owner] was clearly informed by the Coast Guard.

*Id.* at 817. The Coast Guard warning was given to the owner in *Progress Marine* four days after the sinking of the barge. *Id.* at 817, n. 3.

The facts in *Progress Marine* compare favorably with the situation surrounding the sinking of the F.V. LIBERTY: The vessel sank in the navigation channel in the Manasquan Inlet; the vessel sank within the stone jetties of the Inlet which are one hundred twenty five feet across; the Coast Guard issued its Situation Report number two and letter, dated December 13, the date after the incident, advising the owner

of the F.V. LIBERTY of its responsibilities concerning marking of the wreck as a hazard to navigation, the removal of the wreck from the channel and the restoration of the channel for safe navigation; subsequently safety messages to the boating public advised of the position of the capsized F.V. LIBERTY and cautioned mariners to transit the area with extreme caution; and, after removal, the Coast Guard advised the area was no longer a hazard to navigation.

Of further significance is the fact that the owner of the vessel in *Progress Marine* unsuccessfully pursued for ten days various "sue and labor activities" designed to prevent the barge from becoming a total loss. *Id.* at 817. Thereafter it notified its insurer the barge was a constructive total loss and abandoned the wreck to the insurer. In this case, it appears Zurich immediately undertook to remove the wreck pursuant to Coast Guard direction and was under the initial impression the wreck was a constructive total loss. It was only after the removal of the wreck from the channel that efforts were undertaken to consider reconstruction of the wreck.

In *Continental Oil Co. v. Bonanza Corp.*, 706 F.2d 1365 (5th Cir.1983), the Fifth Circuit again applied the reasonableness standard for interpreting the terms "compulsory by law." In that case the charterer of a vessel was obligated under its oil rights lease agreement with the federal government and federal regulations to remove all property from the leasehold within one year from the termination of the lease. *Id.* at 1371. The court held that this obligation did not create the legal compulsion required by the P & I policy. *Id.*

In addition, the *Continental Oil* court noted the factual circumstances in that case made the possibility of liability for the charterer remote. The wreck lay thirty four feet below the surface and was half covered with mud. There was little probability that the wreck would become dislodged, or that other vessels would strike the wreck. *Id.* at 1373.

In this case, it appears there was a duty to remove the wreck and/or the potential for civil liability which would justify remov-

al of the wreck. See *East Coast Tender*, 759 F.2d at 286. In addition, the facts in this case indicate a more substantial danger than was present in *Continental Oil.*

As the Fifth Circuit has stated:

Determining whether removal is legally compelled, we look to the state of affairs as they would appear to a reasonable owner under the circumstances. This is the traditional objective test applied to determine the legal propriety of conduct. It does not look to the bona fides or the state of mind of the owner, an area as difficult to explore as any terra incognita and one whose real condition may readily be masked or feigned.

*Continental Oil,* 706 F.2d at 1370. Although removal is not considered "compulsory by law" only when ordered by a court or pursuant to official directive, the interpretation of the clause should not be so relaxed as to consider removal compulsory when there is only possible exposure to liability. Accordingly, "removal occasioned by a reasonable apprehension of slight consequences for inaction or by an unreasonable apprehension even of grave consequences is not compelled." *Id.* at 1370.

For the reasons stated, I find Zurich was not under an apprehension of slight consequences for inaction or under unreasonable apprehension of grave consequences for inaction. On the contrary, I find, as indicated in *Progress Marine,* Zurich, as agent of the owner, was prudent in its undertakings; its apprehension of liability and appreciation of the significance of such liability were not exaggerated. Accordingly, because the Third Circuit has adopted the Fifth Circuit's "more expansive interpretation of the term 'compelled by law'", as explained, and held that "in the context of this type of insurance policy [the phrase] should not be restricted to situations in which an express order from a governmental body directs removal," *East Coast Tender Serv.,* 759 F.2d at 286, I find the actions taken by Zurich were in fact compelled by law.

The P & I coverage does, however, require that the vessel be a "wreck" in order for wreck removal to be covered. A "wreck" has been defined as a sunken vessel damaged so extremely that it is unnavigable. *M.J. Rudolph Corp. v. Lumber Mutual Fire Insurance Co.,* 371 F.Supp. 1325 (E.D.N.Y.1974). When the F.V. LIBERTY was recovered from the Manasquan Inlet it had lost its entire superstructure. The vessel was unnavigable and therefore meets the legal definition of a "wreck." Thus, the wreck removal provision of the P & I coverage is applicable to this case.

Excess P & I argues this case is identical to the *Seaboard Shipping* case and thus Zurich should pay for the costs of removing the F.V. LIBERTY under the "sue and labor" provision of the hull policy. In *Seaboard Shipping,* 461 F.2d at 502, a barge carrying gasoline went aground and began leaking. The useable gasoline cargo was unloaded and the barge was repaired and refloated. *Id.* The issue was whether the hull insurer or the P & I insurer was responsible for the costs of the labor and material required to remove the barge and its cargo.

The Second Circuit held that the term "compulsory removal" in the P & I policy is a term of art in admiralty

and refers to a situation in which a hull has been abandoned by the owner and the hull underwriter but, pursuant to government order, must be removed from nagivable waters.

*Id.* at 504.[5]

The court held there was no compulsory removal because the owner and hull insurer had not abandoned their interests in the vessel. Specifically, the Second Circuit found:

None of the expenses was incurred soley to avert those occurrences or to protect those interests for which Oceanus [the P & I insurer] alone was liable. All the costs were essential to any attempt to

---

**5.** In *East Coast Tender,* 759 F.2d at 285, the Third Circuit expressly rejected the Second Circuit's construction of the terms "compulsory by law" in *Seaboard Shipping.* The Third Circuit instead adopted the Fifth Circuit's construction focusing on the reasonable expectation of the parties. *Id.* at 286.

save the hull and cargo, so any benefit Oceanus was in a sense incidental. *Id.* at 504–505. Moreover, the Circuit noted that:

> far from abandoning their interest in the vessel, [the owner and the hull insurer] had it towed to New York in the vain hope of salvaging the hull. No governmental order was necessary to spur the removal and the costs of the operation were therefore not chargeable to Oceanus as removal costs under its policy.

*Id.* at 504. Because the removal costs were not covered under the P & I coverage, the court went on to hold that the costs were covered under the "sue and labor" provision of the hull policy. This was because the costs incurred were an attempt to save the hull and cargo. *Id.* at 504–505.

The facts in *Seaboard Shipping* are distinct from those presented in this matter. As I have found, Zurich did not raise the vessel "in the vain hope of salvaging the hull." In addition, the activities of Zurich were in fact spurred on by the Coast Guard. The costs incurred in the removal of the vessel are protection and indemnity expenses. Accordingly, Excess P & I is liable to pay $119,891.15 to Zurich, less the $25,000.00 proceeds of the sale of the wreck, for a total amount due of $94,-891.15. The parties have stipulated to these amounts and the reasonableness of these amounts. (See Stips. 6 and 7.)

### C. *Prejudgment Interest*

█ The general rule in admiralty cases is that prejudgment interest should be awarded unless there are exceptional circumstances mandating against the award. *Matter of Bankers Trust Company*, 658 F.2d 103, 108 (3d Cir.1981), *cert. denied*, 456 U.S. 961, 102 S.Ct. 2038, 72 L.Ed.2d 485 (1982). The Third Circuit has stated:

> Generally, exceptional circumstances exist only when the district court concludes that the party requesting interest has (1) unreasonably delayed in prosecuting its claim, (2) made a bad faith estimate of its

damages that precluded settlement, or (3) not sustained any actual damages.

*Id.* (citations omitted).

There is no evidence of any exceptional circumstances in this case which would make the award of prejudgment interest unequitable. The parties have stipulated that the prime interest rate from August, 1984 to May 19, 1987 was 10.5%. (See Stip. 36.)

### Conclusion

For the foregoing reasons, the costs of removing the F.V. LIBERTY from the Manasquan Inlet are covered under the Excess P & I coverage. Accordingly, the Excess P & I Syndicates are required to pay to Zurich the amount of $94,891.15 plus prejudgment interest together with costs of suit.