**GRUPO PROTEXA, S.A., et al., Plaintiffs,**

v.

**ALL AMERICAN MARINE SLIP, et al., Defendants.**

Civ. A. No. 86–4212.

United States District Court,
D. New Jersey,

Nov. 16, 1990.

As Amended Jan. 16, 1991.

Riker, Danzig, Scherer, Hyland & Perretti by Gerald Liloia, Kenneth Van Deventer, Morristown, N.J., for plaintiffs.

Liddell, Sapp, Zivley & Hill by Harold K. Watson, David D'Aloia, Houston, Tex., and Saiber, Schlesinger, Satz & Goldstein by David J. D'Aloia, Newark, N.J., for defendants.

## OPINION

WOLIN, District Judge.

This is a maritime action, the substance of which centers on the wreck removal provision of a policy of insurance issued to Perforaciones Maratimas Protexa, S.A.C. ("Protexa"). The initial inquiry is whether the wreck removal engaged in by Protexa was compulsory by law. The analytical framework necessary to that determination is set forth in a prior opinion of this Court. *Grupo Protexa S.A., et al. v. All American Marine Slip, et al.*, No. 86–4212, 1988 WL 88442 (D.N.J. Aug. 26, 1988) (1988 U.S. Dist. LEXIS 9339). Cognate to that inquiry is whether Protexa, as required by the policy, acted as a prudent uninsured. The pivotal focus of that probe is directed to Protexa's decision to remove its own wreck without resort to the use of a third-party salvor. Because of unresolved issues of fact this matter was tried before the Court.[1] In accord with Rule 52(a), Federal Rules of Civil Procedure, the following constitutes this Court's findings of fact and conclusions of law.

## I. FINDINGS OF FACT

In the early morning hours of December 14, 1985, the HUICHOL II ("HUICHOL") sank in the watery depths of the Bay of Campeche. A tragic consequence of this occurrence was a significant loss of crew. More than 27 able-bodied seamen accompanied and remained with the HUICHOL until their remains were recovered on February 10, 1986. With this brief scenario at hand, the Court will move to an explanation of the events that precipitated this litigation.

### A. The Parties

The plaintiff Grupo Protexa, S.A., is a Mexican conglomerate engaged in transportation, food stuffs, bottling and canning, tourism, real estate, industrial, construction and drilling and marine operations. It conducts these commercial ventures through separate corporations. It develops and manages maritime construction projects through Condux and Construcciones Maritimas Mexicanas. Condux was the owner of the HUICHOL when it sank. Cruz Script at 2.

The defendant All American Marine Slip ("AMMS") is a marine insurance company, located in New York, that reinsured 30% of the reinsured risk under protection and indemnity policies issued by Mexican insurers. Guerrero Script at 2. The defendant Cigna/AFIA is a marine insurance company that reinsured 5% of that same risk. *Id.*

### B. The Wreck

On December 14, 1985, at approximately 8:00 a.m., the HUICHOL sank in the Bay of Campeche approximately 50 miles offshore from Cuidad del Carmen ("Carmen"). Winds in the vicinity at that time were reported to be 55 knots with seas at 3 meters and a northerly swell at 5 meters.

The wreck of the HUICHOL was located at latitude 19–25.8 degrees north, longitude 091–58.5 degrees west in 45 meters of water. It was lying on a bottom of soft mud, capsized to port at about 150 degrees. Exhibit 221D. It was lying in an inverted position within a Petroleos Mexicanos ("Pemex") oil exploratory zone.[2] Fredericks Script at 6. The wreck lay 1.5 miles within the easterly border of the Pemex zone and over three miles from the nearest oil platform structure. Umbdenstock Script at 3.

---

1. Direct examination of in-court witnesses was presented through question and answer script. References to this testimony are designated as script at a given page, *e.g.,* "Cruz Script at ___."

2. Pemex is an oil and gas company which has exploratory rights in the exclusive economic zone. Pemex is a "Decentralized Public Agency of the [Mexican] Federal Government." Exhibit 202 at 001094.

More than 50 oil drilling platforms and related structures belonging to Pemex are located and operated in this exploratory zone. Cruz Script at 5. Protexa constructs and services the pipelines, platforms and related structures needed by Pemex. Almost 100% of Protexa's maritime construction business flows from Pemex. Moreover, Pemex's production is important to the Mexican economy, since it is a major source of Mexico's hard currency. Cruz Script at 3.

## C. The Policy

The policy of marine insurance was written by Energy Insurance International of Houston, Texas ("EII"). Keith Mollman was an account manager assigned to Protexa's account. Pablo Cruz was Protexa's employee assigned to procure insurance and manage risks for its construction, marine and air divisions. Cruz Script at 1. In 1985 Cruz negotiated an insurance policy covering risks and property damage to all or part of Protexa's Marine Construction Division. All of the risk except for 5% was placed with non-Mexican insurance companies.[3] Cruz Script at 7. The policy written for Protexa was a Protection and Indemnity-type, designated as "SP–23 (Revised 1/56)." The policy had two distinct layers of coverage:

> The primary layer was liable for the first $2,500,000 of any loss covered by the policy. There were four primary level underwriters. They were U.S. Fire which had 35% of the primary level, Wetzel which had 27.5% of the primary layer, AOIS which had 7.5% of the primary level and FFIC which had the remaining 25% of the primary level.

> If any single loss exceeded $2,500,000 it pierced the excess layer and the excess layer underwriters would have to respond to the loss in excess of the primary limit. There were three excess underwriters, those being AAMS which had

30% of the excess layer and various Lloyds/London underwriters which carried 65% of the risk. AFIA had 5% of the excess layer.

Mollman Script at 3.

The total adjusted loss was $12,121,726, of which the primary layer was liable for the first $2,500,000. Mollman Script at 41. Therefore, according to Mollman, the balance for which the excess layer was liable was $9,631,726. Five percent of that liability remained with the Mexican insurance company. The three remaining excess carriers, London, AAMS and AFIA were liable for their respective share of 95% of the balance. Therefore, AAMS, if responsible, owes 30% of 95% of $9,631.726, which equals $2,745,042. AFIA, if liable, would owe 5% of 95% of $9,631.726, which equals $507,000. London, which had already paid its share, owed 65% of 95% of $9,631.726, which equalled $5,947,591. Mollman Script at 41. The hull and machinery claim was $1,523,000; sue and labor,[4] $504,065; and wreck removal, $10,104,461. Exhibit 202D at 000904. Since the hull and machinery plus sue and labor claims amounted to $2,027065, and the primary layer of coverage as only $2,500,000, all but $472,035 of the wreck removal expenses fell squarely on the shoulders of the excess tier of coverage.

The effective date of the policy was from May 1, 1985 to May 1, 1986. AAMS had reinsured Protexa's marine risk in years prior to the policy year in issue. The 1985–86 policy differed from its predecessor in that the prior wreck removal coverage was of a broader form. It permitted wreck removal when it was compulsory by law and also when it was deemed necessary by the assured. EII had attempted to negotiate, on behalf of Protexa, the same coverage for the 1985–86 policy year, but AAMS was unwilling to provide such coverage and the policy that issued for the 1985–86 policy year provided coverage for wreck re-

---

**3.** National regulations required a portion of the insurance to be placed with a Mexican company.

**4.** The purpose of a sue and labor clause is to reimburse an insured for the expenses, such as

the expenses of salvage operations and removal of cargo for safekeeping, of mitigating a covered loss. *Blasser Bros. v. Northern Pan American Line,* 628 F.2d 376, 386 (5th Cir.1980).

moval only when such removal was compulsory by law. Guerrero Script at 2.

■ The policy also required that the assured act as a prudent uninsured in the settlement of claims. Exhibit 258 at 40000591. A prudent uninsured is a term applied to assureds. It indicates that an assured's judgment should be reasonable and employed notwithstanding the existence of insurance.

## D. *Claims Adjustment Process*

The established protocol for channeling communications between underwriters and the assured is the broker. Underwriters receive their information from surveyors/adjusters who are sent to the scene of a wreck for that very purpose. The surveyor is the underwriter's operative on the scene.

> He is their eyes, ears and at times their mouth. It is his responsibility to make sure the underwriters are kept fully informed of what is happening on the scene. He is also responsible for reviewing the insured's claim at the end of the process, making the appropriate adjustments, and issuing the proofs of loss by which the claims are submitted to the underwriters.

Mollman Script at 3. In a situation such as the HUICHOL with multiple underwriters involved, the surveyor files general reports with the broker who in turn contacts the underwriters. Underwriters generally reply through the broker. The surveyor represents the underwriters and is paid by them. Mollman Script at 4.

Immediately after the loss of the HUICHOL was communicated to EII, Rush Johnson Associates ("RJA") was appointed surveyor/adjuster for the underwriters. Captain Theo Tyssen was assigned to this claim. Mollman Script at 4. Tyssen was at the scene of the wreck on December 16, 1985. Mollman Script at 6. AAMS acknowledges that Tyssen served as the eyes and ears of the underwriters. Tr. 469 at 25. However, under no circumstances was Tyssen authorized to enter into contracts on behalf of the underwriter or commit an underwriter to pay any sum in satisfaction of a claim. This was especially true of AAMS. Guerrero Script at 4.

## E. *The Events Succeeding the Wreck*

After Tyssen was dispatched to the wreck, he met with various parties concerning the situation. In a report to Mollman, Tyssen advised that, according to *his* conversation with divers who had tried to do a survey, the vessel was completely saturated with water and was rapidly sinking into the muddy, silty bottom. He also said that the wreck was located in a Pemex zone of heavy drilling activities and it seemed definite that the unit would have to be removed. Furthermore, the Mexican government indicated that, after the vessel was raised and before it could be scuttled, government officials would want to remove the bodies and do an investigation into the cause of the loss. Tyssen said that he had some very preliminary discussions with Protexa's engineers regarding their estimates of time and cost for removing the HUICHOL. Mollman Script at 7.

Meanwhile, Mollman sent an urgent telex to all underwriters, including AAMS, advising them that the HUICHOL sank in heavy weather and that RJA, through Tyssen, had departed for the wreck location. Exhibits 2A–J.

Mollman had also been in contact with Cruz. Based upon discussions they had and the discussions Mollman had with Tyssen, it was determined that Protexa tender abandonment of the HUICHOL to the underwriters and submit their claim for a total loss. A sample telex was provided to Protexa by Mollman on December 17, 1985. Exhibit 13. On that same date, Protexa forwarded a telex to EII for the attention of interested underwriters. Exhibit 10. It mirrored the language contained in the sample telex. All underwriters declined to accept abandonment of the wreck.[5] AAMS

---

**5.** Mollman discussed abandonment in terms of "constructive total loss":

> Where it is likely that the cost of raising the wreck and salvaging it would cost more than its insured value, it is considered a construc-

never responded to the notice. Mollman Script at 10.

Aside from Tyssen's evaluation that the government would probably order the wreck removed, Cruz also shared that opinion. To him, removal was obvious. The wreck was in the *middle* of the oil fields. According to Cruz, thirty-three crewmen were dead. There was obviously going to be a governmental investigation into the cause of the loss and, in any case, there was no way the government was going to allow that wreck to stay there in the middle of the Pemex zone. Cruz Script at 10. Armed with this information, Mollman sent a telex to "Protexa (Cruz)" dated December 17, 1985. In the telex Mollman suggested that if the wreck was to be raised and moved, an immediate investigation should commence to determine if, in fact, the removal was compulsory by law. The telex further advised Protexa that if it was required by law to remove the wreck, the order of removal had to be in writing and issued by an authorized governmental authority. Exhibit 12.

On the afternoon of December 17, 1985, the Port Captain of Carmen issued an order that has been termed by the parties as the written wreck removal order ("removal order"). Exhibit 7. It was written in Spanish. Exhibit 8 represents an English translation of the removal order. Cruz received the order from Alcibiades Fuentes, Protexa's operations manager in Carmen. Cruz then notified EII and Tyssen. He also met with Condux Engineers for the express purpose of having them prepare a removal plan and a time estimate for removal. Upon receipt of Condux's removal plan, Cruz showed it to Tyssen and suggested that an immediate meeting be held in Houston with EII.

On December 17, 1985 Cruz also telephoned Mollman and advised him of the removal order. He expressed the desire for an immediate meeting with EII so that EII could present the removal order to the underwriters. Moreover, Cruz wanted to present Protexa's removal plan and its bid to do the removal without resort to a third-party salvor. Mollman Script at 11. Mollman thought that Protexa's decision to remove the wreck itself made sense since it was going to be essentially a diving and lifting job. In his opinion, Protexa had an abundance of expertise and equipment for this type of operation. Mollman was also aware of the wreck's precarious position in the mud and the sense of immediacy that Protexa felt in responding to the removal order. Thus, conceptually, Mollman did not object to Protexa's offer, but acknowledged that the final determination was to be made by the underwriters. Mollman Script at 11. During cross examination of Guerrero, it was clear that he recognized that salvage operations were the full responsibility of the vessel owner and not that of the underwriters. Tr. at 2–7. However, because of his experience with Protexa in a prior claim (the stranding of the Olmeca), wherein Protexa acted as its own salvor, he was wary of Protexa's involvement in the HUICHOL wreck removal. Guerrero Script at 5. In fact, he felt Protexa should not do the job. Tr. 497 at 22. In later testimony, Guerrero agreed that he had no blind objection to Protexa doing the salvage job. However, Protexa should act as a prudent uninsured. Tr. 504 at 15–19. The clear import of this testimony was that Guerrero, on behalf of AAMS, wanted a bid from a third-party salvor. Tr. 500 at 1.

Mollman, Tyssen and Cruz met in Houston on December 18, 1985. Mollman Script at 11. Cruz presented the removal order and Protexa's removal plan. They agreed that it appeared that removal was required and that the removal plan was sound. Mollman attempted to telephone the under-

---

tive total loss. Where a constructive total loss occurs, the insured has the right of tendering abandonment of the vessel to the underwriters. If the underwriters do not decline the abandonment, they are entitled to the benefit of any salvage value the vessel may have, but also liable for any third-party liability that may arise from the wreck itself. Moreover, until such time as it is determined that the vessel is a constructive loss and an abandonment tendered, the insured has a duty under the Policy to do everything in its power to prevent further loss.
Mollman Script at 9.

writers, but was only able to reach three of them. He was not able to contact AAMS or the London underwriters. To those underwriters whom he reached, Mollman explained the circumstances of the removal order, the current condition of the wreck vis-a-vis the sea bottom, and Tyssen's evaluation that it was important to start the wreck removal without delay in order to minimize expenses. Mollman Script at 12. These underwriters, in response, agreed to waive any requirement that Protexa obtain a second or third salvage bid and advised that Protexa should begin work immediately to avoid further complications and to minimize expenses. Mollman Script at 13. Confirming telexes were sent to these underwriters on December 20, 1985. Exhibits 25, 26 and 27. The substance of the underwriters' response was communicated to Cruz by Mollman and Tyssen. Cruz understood from them that the underwriters had approved Protexa for the job and that the job should commence immediately. Cruz Script at 15. Prior to this meeting and telephone contact with the underwriters, Mollman sent a telex to Protexa, in which he recounted the problems previously encountered with the Olmeca and the Kikapu. Mollman strongly suggested that Protexa obtain at least one, and preferably two, outside bids for the salvage of the vessel. He also reminded them of their obligation to act as prudent uninsured. Exhibit 266.

At the Houston meeting, the cost of the wreck removal was also discussed. Cruz provided a day rate proposal. Tyssen suggested that the underwriters be given a lump sum option. The day rate offered by Protexa was $224,608 for a period of 24 days which would result in a total cost of $5,390,592. Protexa's lump sum offer to salvage the vessel was $3,785,800. Tyssen communicated these alternative offers to interested underwriters by telex from Houston on December 19, 1985. Exhibit 21. In the telex he suggested acceptance by the underwriters of the lump sum bid. His closing paragraph requested the underwriters' advice as to whether Protexa

should proceed on a day rate or a lump sum basis. He requested this advice before the close of business on December 19, 1985, before 5:00 P.M. Houston time. AAMS' copy of the telex, Exhibit 30, was not received by AAMS until December 20, 1985, the day after its designated reply was due. Clearly, AAMS could not respond to a telex in advance of its receipt. Guerrero Script at 4.

By December 20, 1985, all the underwriters had been advised that Protexa was going to do the job; that each had the opportunity to review the day rate versus the lump sum bid; and that all of them had agreed to the lump sum bid except AAMS and AFIA, who took no position. Mollman Script at 16. A caveat attached to the underwriters' acceptance of the lump sum bid was that there exist a consensus among all the other underwriters that the lump sum would be their choice. Mollman Script at 15. Wetzel accepted the lump sum price on December 20, 1985 by telex with the proviso that agreement by other "participages" can be confirmed in writing. Exhibit 23. Since it was clear that all the underwriters had not accepted the lump sum price, Mollman told Protexa that it should consider the job to be on a day rate basis. Mollman Script at 17. Cruz Script at 16.

AAMS responded to the Tyssen telex on December 20, 1985 by its own telex addressed to EII. It counseled the assured to take all necessary steps to minimize the loss and expressed their desire to have a third party salvor get involved in the removal of the vessel. Exhibit 25.[6]

Although AAMS did not clarify what it meant by its request for a third party salvor's involvement, Mollman inferred that Tyssen had explained to Guerrero's satisfaction why it made sense to use Protexa instead of a third party salvor. Mollman Script at 17. Exhibit 36 contains a reference to a Tyssen–Guerrero telephone conference of December 23, 1985. In this telex to Mollman, Tyssen stated, apparent-

**6.** Tyssen, in his deposition, Transcript 206 at line 8, did not remember seeing the AAMS telex, Exhibit 24. Moreover, at line 15 he acknowl-

edged that a document such as that telex appeared to be important with reference to the job he was doing at the time.

ly speaking for Guerrero, that a second bid for salvage appeared to be obsolete since the HUICHOL was sinking in the mud and the vessel TOLTECA was in the area foregoing the necessity of mobilization charges. He also indicated that Guerrero was apprised of the authorities' demand for expedient removal.

Despite Tyssen's advice to Mollman as to his discussion with Guerrero, AAMS sent a telex to Tyssen on December 23, 1985 and inquired whether there was a mandate from a regulatory body requiring Protexa to remove the HUICHOL. AAMS also indicated, *inter alia*, that it was sending its own representative, Claude Pritchett, to be present during the raising of the HUI-CHOL. Exhibit 34. No significant communication transpired between the parties or their agents during the remainder of calendar year 1985.

F. *The Port Captain's Order*

On December 17, 1985 the Port Captain of Cuidad del Carmen issued a written order. Its English translation was received in evidence as Exhibit 8. Because it is the ignition that sparks the engine of this litigation, the Court will set out its text at length.

> SUBSECRETARIAT OF OPERATION DIRECTORATE GENERAL OF MERCHANT MARINE.
> OFFICE OF THE CAPTAIN OF THE PORT SECTION OF MARINE SHIPS
> OFFICIAL COMMUNICATION CP–3312–23–3350 File.1

OFFICE OF THE CAPTAIN OF THE PORT

CALLE 20 No. 29

P.O. Box 24100

RE: This is a communication concerning salvage of the vessel 'HUICHOL' of your Company
Cuidad del Carmen, State of Campeche
December 17, 1985

TO;

CAPTAIN CARLOS H. MERINO GARCIA DE ALBA
CHIEF OF MARINE OPERATIONS OF THE COMPANY

"CONDUX", S.A. DE C.V.

AV. PERIFERICO 8 North

C I T Y . -

This Maritime Authority is pleased to resolve after analysis of the procedures conducted by it in connection with the sinking of National Motor Vessel ("Buque Motor de Posicionamiento Dinamico Nacional") named "HUICHOL" having the following characteristics: 499.83 gross tons, 151.57 net tonnage, registered in this Port under number 2623 and owned by your Company, (to) refer the following procedures to Higher Authority (in order) to request Expert Opinions from technical personnel and reports as to the causes that occasioned the sinking of said Vessel at the following coordinates marked by radar: Latitude 19° and Longitude 91° 58.5′ W., and therefore, based on the Sole Article published in the Official Newspaper ("Diario Oficial") of the Federal Government dated March 28 of this year and on Articles numbers 86 of the Law of Navigation and Maritime Commerce ("Ley de Navegacion y Comercio Maritimo") and 262 and 263 of the Law of General Means of Communication ("Ley de Vias Generales de Comunicacion"), requests that such Company "CONDUX" S.A. de C.V., deposit the sum of Pesos $10,000,000.00 (Ten Million Pesos and 00/100, Mexican Currency) to guarantee the cleaning up of the area and the salvaging of said Vessel, in addition to guaranteeing any damage or loss that may arise in the course of the salvage operations, hereby stating by way of clarification that such sum may be furnished by a Bond or Deposit of Guaranty ("Billete de Deposito") furnished by an Insurance Company to the name of the Treasury of the Federal Government and for availability to the General Directorate of the Merchant Marine, a term of 25 days from the date of notification of this resolution hereby being granted as provided in the above cited Article 86.

Respectfully,

The Captain of the Port,

s.)

CAP.ALT. I.G. MIGUEL A. REBOL-LEDO GUIOT

(Seal of the United Mexican States)

(Seal of the Directorate General of Merchant Marine

Office of the Captain of the Port

Ciudad del Carmen, State of Campeche)

Copies: To the DIRECTOR GENERAL OF MERCHANT MARINE.—

For the information of Higher Authority.—

Respectfully.—

Jose Maria Ibarran No. 47.—

03900 Mexico, D.F.

Protexa interpreted this order as a wreck removal order. Cruz Script at 11. It further concluded that the government wanted it done immediately. Protexa was concerned that if they did not remove the wreck, the Navy would do it and that would be bad for Protexa. Indeed, Protexa was of the opinion that no one who does business in the Mexican Gulf would ever seriously question the Port Captain's authority to order the removal of a wreck from a Pemex exploratory zone—particularly where there had been such tragic loss of life. When the Port Captain says move, you move. Cruz Script at 18.

Cruz referred the Port Captain's order to Protexa's legal counsel with the request that it be reviewed and with the admonition that if there is a problem, Cruz should be notified immediately. He was never advised by the Protexa legal department that there were any problems. Cruz Script at 12.

A Protexa staff attorney, Jorge Uriarte, was chosen to review the order. He was a member of a response team that Protexa formed to deal with the HUICHOL situation. Exhibit 208. On December 19, 1985, he was requested to travel to Carmen. In fact, he was recommended by his immediate supervisor, Galdino Canseco, because of his prior experience as a government attorney. Because of the onset of the Christmas holidays, Uriarte was reticent to be away from home, and his reticence continued until Jose Garcia, the corporate director, agreed to provide the company's aircraft for him to fly to Carmen and to return him home for the Christmas holidays. On December 20, 1985, Uriarte went to Carmen. Uriarte Script at 4. Before Uriarte went to Carmen, he was aware that the sinking of the HUICHOL was a serious government problem and that, due to the loss of life, the Procuraduria General de la Republica ("PGR") had ordered an investigation.[7] He also knew that the HUICHOL had sunk in a Pemex exploratory zone located in the Bay of Campeche between the Port of Carmen and the Cayo Arcas terminal. It was his opinion that the federal government exercises jurisdiction over these waters. Uriarte Script at 7. Moreover, in his opinion, the Exclusive Economic Zone extends 200 miles off shore. Furthermore, he contended that the Port of Cayo Arcas, as distinguished from the city of Cayo Arcas, is "the Pemex zone." *Id.* Since there is no Port Captain assigned to Cayo Arcas, the Port Captain of Carmen is responsible for all matters of the Maritime Authority which may occur in the jurisdiction of Cayo Arcas. *Id.* The most pressing problem for Protexa, as expressed to Uriarte by Canseco, was to obtain the release of the bodies to the families of the deceased and to provide the PGR with information that the PGR had requested as part of its investigation relating to the HUICHOL. Uriarte Script at 8.

Upon Uriarte's arrival at Carmen in the morning on December 20, 1985, he was briefed by other members of the response team. He was told of the Port Captain's order, of the underwriters' approval of Protexa to raise the wreck and of an imminent meeting with family members of the deceased crew to announce that Protexa would be raising the wreck. However, before Protexa actually started wreck removal, it wanted to rule out the possibility of a

---

**7.** The PGR is the public ministry in charge of all matters in the country which arc of a federal nature. The Procuraduria General is appointed by the President of the Republic and is his attorney. The PGR is similar to the United States Justice Department. Uriarte Script at 5.

legal challenge to the order.[8] *Id.* He was given a copy of the order and reviewed it along with the relevant statutes which define the office of the Port Captain and the limits of his office.[9] From this review, which lasted 45 minutes, he concluded that "it was clear beyond a doubt that the order had to be complied with." This decision was communicated to the Protexa people, who then announced to the crowd of survivors that the removal operation would begin. Uriarte Script at 9. He also communicated his opinion to Fernando Perez, the divisional director of Condux, by telephone. Uriarte Script at 10.

Uriarte's legal background was in criminal and general corporate law. Tr. 291 at 20. He had no training in maritime law. Tr. 291 at 17. Nor had he ever been involved in another legal matter involving removal of the wreck of a vessel. Tr. 291 at 23. Indeed, he did not know of any other cases in Mexico which dealt with a government-ordered wreck removal. Tr. 292 at 4. Resort to a legal opinion from outside counsel did not occur until after the wreck had been removed. Tr. 293 at 5. Lastly, Uriarte never issued a written legal opinion about the validity of the order to any Protexa official. Tr. 293 at 8.

Uriarte, in support of his opinion that the Port Captain's order was a wreck removal order, relied on two segments of the writing. He first pointed to the word "rescate" used in the reference line immediately preceding the body of the order. Although he thought it meant rescue, the interpreter corrected the translation to indicate that "rescate" meant raising. Tr. 301 at 5–10. Uriarte's second point of reference was to the statutory citations contained in the body of the order. Tr. 301 at 22–25. From these points of reference, Uriarte determined that it was a wreck removal order. Tr. 307 at 18. Despite Uriarte's perception as to the clarity of the removal order, he admitted that the order did not impose a

time limit on raising the wreck of the HUICHOL. Tr. 310 at 23. The 25 days mentioned in the order refers to the time limit to post a bond. Tr. 308 at 21. Another factor that influenced Uriarte that the removal order was valid was the Mexican government's sovereignty over its territorial waters and in his opinion that would include the waters in the exclusive economic zone. Tr. 316 at 10–24. When questioned about the United Nations Convention on the Law of the Sea ("Law of the Sea") and its limit on signatories' territorial waters to 12 miles from their respective coasts, Uriarte admitted he had never read it and was unaware of its provisions. Tr. 317 at 20–25. Moreover, he was unaware that the Mexican Congress had adopted the Law of the Sea. Tr. 318 at 7.

Reference to potential Pemex installation damage and the order of the Port Captain directed toward investigation of the incident, as well as recovery of the dead bodies, were other factors that Uriarte considered in his determination that the removal order was valid.

On December 21, 1985, Uriarte visited the office of the Port Captain in an effort to obtain from him a suspension of the order or perhaps even a rescission of it. Uriarte Script at 10. Uriarte observed that the Port Captain was under a lot of pressure from the Federal Public Ministry to remove the wreck from the Pemex zone and to conduct a visual and physical investigation of the HUICHOL. Uriarte Script at 11. He was told that any rescission or modification of the order would have to occur through the officials in Mexico City. *Id.* Moreover, the Port Captain made it very clear that he expected Protexa to start the operations without delay or the Navy would immediately make the necessary arrangements for the removal and that Protexa would be punished to the full extent of the law. Uriarte Script at 12.

---

**8.** The operative date when the wreck removal commenced was stipulated as December 19, 1985.

**9.** Authorities relied upon were The Law of Maritime Navigation and Trade, The Organic Law of Federal Public Administration, the Laws of General Ways of Communication, and The Law of Amparo. Tr. 293 at 16–23. Amparo is a very broad mechanism in Mexican jurisprudence and is loosely interpreted as an "injunction." Tr. 294 at 12.

Uriarte reported the substance of his visit with the Port Captain to Fernando Margain, Protexa's general counsel. In that conversation, Uriarte told him that he did not see any way that Protexa could oppose the order. Marco Sotomayor, Protexa's director of finance, was similarly advised. Uriarte also contacted Carlos Paniagua, Protexa's legal director in Mexico City, so that an informal approach could be made to Captain Fraga, general director of the Merchant Marine.[10]  *Id.*

Beyond providing Protexa with his opinion as to the validity of the removal order, Uriarte advised them of five consequences that could occur to it for non-compliance with the wreck removal order. They were as follows:

[1]  [T]he threat that is provided for in the relevant law, and which was affirmed to me by the Port Captain, i.e., that if we did not immediately begin the removal operation, the government would make arrangements to do it itself and hold us liable. We would have absolutely no control over the conduct of the removal operation or its cost, but merely would be required to fully reimburse the government for whatever bill it presented.

[2]  [T]here was the potential for catastrophic liability to third-parties if the wreck were to move within the oil field and do damage to a pipeline or other submarine installation. This liability would be almost absolute if any accident occurred after we had refused to comply with a valid removal order.

[3]  [T]here was the sanctions or fines which could be imposed on a sliding scale for failure to comply with the order or to cooperate with the investigation. These fines would continue to accrue as our non-cooperation continued.

[4]  There was also the risk of forfeiture of the vessel and of the bond.

[5]  [T]here were obviously going to be grave consequences for our relation-

ships with the government and with Pemex if we were to disobey an obviously valid order. It seemed clear that the government had a valid interest in getting the wreck raised and removed from the oil fields and to disobey and ignore such a valid national interest would not be wise.

Uriarte Script at 16.

After concluding that the removal order was valid and after weighing the consequences that could occur for non-compliance, Protexa did not legally challenge the order through an Amparo proceeding. Uriarte's opinion was that the removal order as valid and that there was no legal basis for bringing an Amparo. Furthermore, a stay or suspension of the order pending determination of an Amparo was unlikely unless the district judge determined preliminarily that Protexa would prevail on the Amparo and that the failure to suspend the order would likely cause irreparable harm. Uriarte Script at 17.

### G.  *The Wreck Removal*

The wreck removal commenced on December 19, 1985. Tyssen, in a telex to interested underwriters, dated December 19, 1985, expressed an opinion that the removal of the wreck would take approximately 15 days, plus an additional six days to deliver it to an approved location. Because of this estimate, he suggested that the underwriters accept the lump sum bid. Exhibit 21.

The concept of the removal plan was to pass slings under the wreck using cranes. Then the wreck would be uprighted, lifted to the surface, dewatered and floated. Cruz Script at 19.

As of January 8, 1986 it appeared that the lifting of the HUICHOL would commence imminently. Mollman Script at 20. By telecopy dated January 9, 1986, Tyssen advised interested underwriters, through

---

**10.**  "The Port Captain is an administrative authority who reports to the general office of the Merchant Marine. The director of the Merchant Marine in turn reports to the Under-Secretary of Operations of the Ministry of Communications and Transportation, who in turn re-ports to the Secretary of Communications and Transportation." Uriarte Script at 5. The latter position is a cabinet-level ministry that regulates maritime commerce. The Secretary reports directly to the President of the Republic. *Id.*

EII that the target date for completion of the entire salvage job was between 13 January and 18 January, depending on the weather. Exhibit 43. That same day Mollman sent a telex to AAMS providing it with the information contained in the Tyssen telecopy. Exhibit 44.

The HUICHOL was not raised within the next few days. Unanticipated problems with the slings occurred which impeded the lift. Mollman Script at 20. According to Cruz, the problem occurred because a ship passing through the area during a storm snagged the HUICHOL with its anchor. The vessel shifted and debris lodged under the wreck, making passage of the slings underneath it impossible. Cruz Script at 20. On January 17, 1986, Protexa decided to tunnel under the HUICHOL in order to pass wires. Progress was exceedingly slow. Exhibit 221 at 10000278.

At or about this time Claude Pritchett, a surveyor/adjuster, present on site and representing AAMS, suggested to Protexa that it needed professional help due to the slow progress of the job. Cruz Script at 22. Protexa authorized Tyssen to contact and retain a professional salvage master to assist Protexa. Alex Rynecki, Inc. was hired and it assigned Robert Umbdenstock to assist Protexa in the task of removing the wreck. Umbdenstock arrived in Carmen on January 21, 1986, and, immediately after his arrival, travelled to the site of the wreck. Exhibit 202d at 000914. As the removal effort continued, Protexa remained the effective manager of the removal and Umbdenstock provided salvage consulting service to it. Exhibit 221 at 10000279. Umbdenstock found that the basic salvage plan, the sling and lift method, was conceptually sound. However, he was critical of the diving operation and the lack of effective on-site management. Umbdenstock Script at 4. Umbdenstock made a number of observations and recommendations that were never implemented during his three week stay at the wreck site. His role was limited to an advisory capacity. Umbdenstock Script at 5.

Notwithstanding the difficulties encountered, all of the tunnels had been completed by February 6, 1986. Exhibit 202d at 000919. By February 9, 1986, all lifting slings were in place and the HUICHOL was lifted 10 meters off the bottom. On the following day, February 10, 1986, the HUICHOL was lifted and suspended in the crane. Body recovery operations commenced but were interrupted due to adverse wind and swell conditions. A decision was made to relocate the HUICHOL to shallow water. On February 11, 1986, the crane vessel TOLTECA, reanchored in 20 meters of water and body recovery operations resumed. Twenty-one bodies were removed from the wreck.

During the body removal, Protexa spent many hours trying to refloat the HUICHOL but was unsuccessful. More bad weather arrived with increasing swells and the HUICHOL was placed back on the sea bottom in shallow water, about 20 meters deep and at a location outside the Pemex oil exploratory zone.[11] Exhibit 221 at 10000285–287.

## II. THE DISPUTE

AAMS refuses to pay its 30% of 95% of $9,631,726 which equals $2,745,042. AFIA likewise refuses to pay its 5% share which equals $507,000. Through AAMS' leadership both of these defendants assert that the wreck removal engaged in by Protexa falls outside the coverage provided by the policy, since the HUICHOL's removal was, according to defendants, not compulsory by law. Moreover, defendants assert that even if the HUICHOL's removal was compulsory by law, Protexa failed to act as a prudent uninsured and by its own conduct is precluded from the recovery sought. Protexa counters that the removal was compulsory by law and that at all times it acted as a prudent uninsured. Therefore, Protexa argues, it is entitled to a judgment against each of the defendants.

## III. CONCLUSIONS OF LAW

With the sinking of the HUICHOL, accompanied by a substantial loss of its crew,

---

11. The sinking of the HUICHOL in shallow water was the result of a successfully negotiated agreement between Protexa and the Carmen Port Captain.

Protexa was faced with a disaster of immense national import. Enormous amounts of pressure from diverse sources, all with legitimate concerns, were directed at Protexa. The families of the deceased crew members were clamoring for the remains of their lost loved ones. The oil workers, Mexico's most powerful union, joined in support with the families to raise the wreck to recover the bodies of their comrades. Pemex, upon whom Protexa was economically dependent, demanded that Protexa raise and remove the vessel from their oil exploratory zone. Lastly, as perceived by Uriarte, the Mexican government had issued an order that the vessel be raised and removed from the Pemex exclusive economic zone. Surely Protexa, even as large and sophisticated a company as it was, experienced extreme discomfort from the moral and economic forces that were being exerted in its direction.

Undoubtedly, the sinking of the HUICHOL was a dark day in the history of Protexa's commercial operations. No similar incident of this magnitude had ever befallen it. Prior salvage involvement with the OLMECA and the KICKAPOO were shallow water operations without wreck removal implications. Indeed, none of Protexa's personnel had any deep water wreck removal experience prior to its decision to remove the HUICHOL. Tr. 111 at 7–24, Tr. 112 at 1–6.

Protexa, prior to commencement of its wreck removal operations was aware that the reinsurance underwriters, whether it be the primary or excess level, would honor its claim *only* if the removal was compulsory by law and it acted as a prudent uninsured. The Court will now examine each of these aspects of the litigation in light of the factual history, the trial testimony and the analytical framework that evolved from a prior court review in response to the parties' cross-motions for summary judgment.

### A. *Compulsory By Law*

Each of the parties have cited to the Court a myriad of legal authority that they assert is case dispositive of the compulsory by law issue. For the most part, the statutory authority they cite, except for the United Nations Convention on the Law of the Sea (the "Law of the Sea"), is identical and referred to in the removal order. Moreover, the interpretation each places on the clear language of these laws is diametrically opposite. Protexa contends that they demonstrate the validity of the removal order. AAMS counters that they are patently invalid on a facial reading and that when reviewed in *para materia* with the Law of the Sea, their invalidity is no longer facial, but real. No Mexican jurisprudence has ever construed these statutes as to their applicability to an offshore wreck such as the HUICHOL, nor has any judicial decision been rendered by a Mexican court that has reviewed the interplay between the statutes cited and the Law of the Sea.

■ In the Court's August 26, 1988 opinion, it recognized that the act of state doctrine generally precludes United States courts from reviewing acts of foreign governments and that is particularly true in respect to a controversy regarding property allegedly located outside of that state's territorial waters, and whose location is in potential conflict with a provision of a treaty. Opinion at 11. [12] Here, as in *Progress Marine, Inc. v. Foremost Ins. Co.*, 642 F.2d 816 (5th Cir.1981), *cert. denied*, 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1982), the absence of governmental authority to order removal of the wreck, even if true, is not necessarily issue dispositive and is merely one of the factors that this Court must look at in determining whether removal of the HUICHOL was compulsory by law. Because of the Court's prior expression of its understanding of the term "compulsory by law" it will assume, without deciding, that the Port Captain's removal order was valid.

Several courts have explored the words "compulsory by law" in the context of ma-

---

12. The act of state doctrine provides that courts in the United States will generally refrain from examining the validity of a foreign state's governmental acts in regard to matters within its own territory. *Environmental Tectonics v. W.S. Kirkpatrick, Inc.*, 847 F.2d 1052, 1057–58 (3d Cir.1988), *aff'd*, — U.S. ——, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990).

rine insurance policies with varying opinions as to the effect these words should be given. A review of these courts' analysis of such language is therefore in order.

In *Seaboard Shipping Corp. v. Jocharanne Tugboat Corp.*, 461 F.2d 500, 504 (2d Cir.1972), the court construed the term "compulsory of law" to be a "term of art in admiralty law" which specifically required abandonment of the vessel by the owner and the hull underwriter and an express order from a governmental body directing removal. Because in that instance the owner and hull underwriter had not abandoned their vessel nor had a government order directing removal been issued, the court denied recovery under the insurance policy. In the current action, as in *Jocharanne*, there has been neither abandonment nor a removal order.[13]

The Fifth Circuit Court of Appeals has also had the opportunity to examine the meaning of the phrase "compulsory by law" in the context of marine insurance policies. In *Progress Marine*, the court reviewed the authorities relied upon by the *Jocharanne* court, but rejected the Second Circuit's analysis of the phrase "compulsory by law" as "a term of art"; instead, it adopted an interpretation of such phrase that it described as more consonant with the reasonable expectations of the parties. *Progress Marine*, 642 F.2d at 820. Beginning its analysis with a review of some general principles concerning construction of insurance policies, the court in *Progress Marine* noted that "in construing an insurance policy reference must be made to the reasonable expectations of the parties as to the risks and protection against them." *Id.* at 818. Thus, the court concluded that "where removal was reasonably required by law or where failure to remove would have reasonable [sic] exposed an insured to liability imposed by law sufficiently great to justify the expense of removal, then, we

believe, such removal could be considered 'compulsory by law' for purposes of recovery." *Id.* at 820.

Likewise, two years later, the Fifth Circuit in *Continental Oil Co. v. Bonanza Corp.*, 706 F.2d 1365, 1369 (5th Cir.1983), construed the words in the phrase "compulsory by law" in their "plain, ordinary, and popular sense." The court, turning to the Random House Dictionary for its analysis, stated:

> The Random House Dictionary (8th ed. 1981) defines 'compulsory' in two different senses. One is 'using compulsion; compelling; constraining.' The other is 'required without exception; mandatory; obligatory.' The first sense betokens that compliance is impelled, perhaps by sanctions The second more closely suggest an unavoidable mandate. The policy does not unambiguously adopt either definition. We must consider not only what is 'compulsory', but also what is meant by compulsion effected by 'law'. *Jocharanne* decided that, as a term of art, the phrase had the second meaning: removal is compulsory by law only when a governmental, or, perhaps, judicial body directs it. Restricting 'compulsion' to the mandate of a governmental agency rather than according it the usual significance of the generalized command of a statute or judicial decision narrows the meaning of the term considerably and, we think, unjustifiably.

*Id.* at 1369.

The court thereafter determined that removal should not be considered compulsory by law only after "a court has rendered judgment requiring it or when an official has issued a fiat." *Id.* at 1370. Rather, in determining whether removal is legally compelled, the court stated that one must look to the state of affairs as they would

**13.** The Court stated in its August 26, 1988 Opinion that both of the *Jocharanne* criteria, *i.e.,* abandonment and a removal order—have been met. Opinion at 13. However, as the Court's Findings of Fact elaborate in detail, Protexa obviously did not abandon the HUICHOL; likewise, the Port Captain's Order does not require

wreck removal. *See infra* at 1222. Because the Court did not apply *Jocharanne*'s definition of "compulsory by law" in denying summary judgment, *see* August 26, 1988 Opinion at 17, the Court's misstep did not lead to a misdirection of the entire case.

appear to a reasonable owner under the circumstances.[14] *Id.*

The Third Circuit in *East Coast Tender Service v. Robert T. Winzinger,* 759 F.2d 280 (3d Cir.1985), similarly rejected the Second Circuit's analysis in *Jocharanne* and adopted the test previously set forth by the Fifth Circuit in *Progress Marine* and *Continental Oil.* Although there was no government order involved in the *East Coast* action, the court held that a protection and indemnity insurance policy should not be restricted to situations where there was an express order from a governmental body directing removal and found that such a narrow interpretation could lead to inequitable results. 759 F.2d at 286.

Plaintiff has argued previously that the above cases clearly indicate that "the mandate of a government agency, a direct command, or an official's fiat would *ipso facto* constitute legal compulsion." Plaintiff's Motion Brief at 17. Thus, plaintiff submits that because in this instance it was faced with an order from a government official which appeared to be backed with sanctions and/or fines, as well as a requirement that plaintiff repay the Mexican government for its costs of removal if the order was not complied with, removal of the HUICHOL was "compulsory by law," and it is now "legally meaningless for defendants to claim, in hindsight, that the sanctions *may have been* unenforceable if challenged in a Mexican Court." Plaintiff's Motion Brief at 18 (emphasis in original).

In opposition, defendant asserts that the cases which have interpreted the phrase "compulsory by law" have clearly established a balancing test of reasonableness in which three factors—the likelihood of exposure, the sanctions for failure to remove, and the cost of removal—must all be examined in order to determine if removal was, in fact, "compulsory by law." The exist-

ence of an order, defendant avers, is but one factor to be considered in the balancing test. And where, as defendant alleges exists herein, the order issued is invalid, the likelihood of exposure to sanctions for failure to remove should be considered a nullity such that it cannot possibly justify any cost of removal for plaintiffs.

■ Based upon a careful review of the cases cited above, this Court has adopted a position somewhat in the middle of the parties' viewpoints and concludes that the determination of whether removal of a vessel was "compulsory by law" must be decided by looking to the state of affairs as they would appear to a reasonable owner under the circumstances and examining whether failure to remove a wreck would likely expose such owner to liability imposed by law sufficiently great in amount and probability of occurrence to justify the expense of removal. In other words, in this action, would a reasonable owner faced with the Port Captain's December 17, 1985 Order (the "Order"), determine that failure to remove the HUICHOL would likely expose it to liability imposed by law sufficiently great in amount and probability of occurrence to justify the expense of removal.

■ This approach differs from plaintiff's version in that the mere existence of the Order does not *ipso facto* make removal compulsory by law. Rather, an examination of the Order must be undertaken to determine if a reasonable owner would think that the Order, if not complied with, would likely expose it to liability sufficiently great to justify removal. If, for example, the Order had merely threatened a fifty dollar fine for non-compliance, it would certainly not justify a removal operation estimated to cost several million dollars.[15]

14. While the court in *Progress Marine* had adopted a two-part objective/subjective test for the determination of whether removal was in fact compulsory by law, the *Bonanza* court eliminated the subjective inquiry stage and focused solely on what a reasonable assured would have done, not on the thought process of the actual assured or his counsel on a given day. 706 F.2d at 1371.

15. Note that defendant's assertion that the plaintiffs merely faced a $20,000 sanction for noncompliance with the Order appears to be a matter in dispute. Plaintiffs claim that in addition to the fine, their noncompliance with the order would have exposed them to liability for the Mexican government's cost of removal, a cost factor over which they would have no control.

■ Similarly, this Court's approach stands in contrast to defendant's position, since the actual validity or invalidity of the Order is not dispositive. It is the liability which the Order *appears likely to expose one to* which is pertinent to the determination of whether removal was compulsory by law. It is, after all, more probable than not that a reasonable owner faced with that which appears to be a valid removal order threatening substantial penalties and/or fines for noncompliance thereto, would determine that its failure to abide by the terms of such order would likely expose it to significant liability under the law.

### 1. Protexa's Contentions

Protexa contends that it was presented with a formally drawn document which had the official seal of the Port Captain attached. It was aware that failure to comply with a government order could expose it to the type of sanctions that its counsel Uriarte catalogued. Moreover, it attributed a presumption of validity to the removal order, since a party who is the focal point of such an order is not free to disobey it, especially in view of the regularity that normally attaches to acts of government officials. As Cruz stated, "when the Port Captain says move, you move."

After receipt of the Port Captain's order, Cruz gave a copy of it to Mollman, Tyssen and Uriarte. On December 20, 1985, after Uriarte reviewed it, including the statutes it recited, he advised Protexa's response team that the Order was valid. Additionally, he informally met with the Port Captain for the express purpose of having him either suspend or rescind the order. When this effort failed, Uriarte determined and advised that since the order was valid, no Amparo proceeding was appropriate and it must be complied with. With this narrative history in mind, Protexa commenced and continued removal operations until the vessel was raised.[16]

### 2. AAMS' Contentions

Beyond the patent invalidity of the Port Captain's Order, which this Court has already rejected, AAMS submits a host of additional reasons to buttress their argument that the raising of the HUICHOL was not compulsory by law. Rather, AAMS submits, moral and commercial considerations determined Protexa's conduct and ultimate decision to raise the HUICHOL.

The moral and commercial consideration argument is bottomed on the fact that Pemex is Protexa's only maritime construction client. Without Pemex's economic favor, Protexa's marine construction operations would be placed in grave jeopardy. The hard economic reality of that relationship is that Pemex's desire was Protexa's command, despite the fact that the contract between Protexa and Pemex was silent as to wreck removal. Moreover, Pemex is the Mexican government's sole licensee for oil and gas exploration and represents its primary source of hard currency.

The recovery of the lost crew for the solace of their families and to promote good relationships with Protexa's other employees who belonged to Mexico's strongest labor union evokes both moral and commercial motives for a prompt response. Since this occurrence was a national disaster, Protexa wanted to blunt adverse publicity by raising the HUICHOL without delay.

Defendants also question the soundness of the legal advice provided to Protexa by Uriarte. They argue that had Protexa been given proper legal advice, it would not have complied with the Port Captain's order. In support of this theory, defendants are very critical of Uriarte. Their criticism begins with the cursory 45 minute review of the removal order and statutes pertaining to the authority and jurisdiction of the Port Captain. The failure to prepare a written opinion and the failure to consult with independent maritime counsel, especially in view of Uriarte's commercial and

---

16. The removal commenced on December 19, 1985 and concluded on February 10, 1986, a period of 53 days.

corporate experience, weighs heavily in their evaluation of his legal unfitness. Furthermore, the informal application of Protexa for suspension or rescission of the Port Captain's order was unprofessional, since Uriarte was uninformed of pertinent information necessary to make a proper presentation. For example, Uriarte was unable to present an argument directed to the authority of the Port Captain beyond the 12 mile limit, since he was unaware of it. He had no knowledge of the exact location of the wreck and whether it constituted a true hazard to navigation or a threat to the environmental well being of the area. He was unaware of its proximity to oil drilling platforms and related structures and had no knowledge of the condition of the vessel as it related to its position on the sea bottom. Beyond the information he lacked pertaining to the vessel, he was uninformed as to the plan of removal, cost factors of removal and availability of experienced third-party salvors. When confronted with the Port Captain's demand for immediate removal, he lacked information as to whether the Mexican Navy had the capacity to remove the wreck or the availability of third-party salvors to the Mexican Navy. In essence, Uriarte's visit to the Port Captain and his presentation was in fact no presentation and unworthy of judicial cognizance.

Defendants' criticism of Uriarte persists because of his failure to formally challenge the Port Captain's order through an Amparo proceeding or by application to a court of competent jurisdiction. Moreover, they contend that the litany of sanctions confided to Protexa by Uriarte were in fact meaningless and an insignificant factor in the course of events that followed. Hence, defendants conclude that the wreck removal that commenced on December 19, 1985 was not compulsory by law. Coupled with the preceding arguments is AAMS' demand for a third-party salvor which Protexa ignored. Had a more reasoned legal opinion been prepared and a third-party salvor consulted, an appropriate presentation could have been made to the Port Captain which would have obviated Protexa's removal of the HUICHOL.

### 3. The Removal of the HUICHOL Was Not Compulsory by Law

■ The sinking of the HUICHOL was a peradventure occurrence. The record is barren of any evidence that its sinking resulted from a faulty hull or deficiencies with its maintenance. Moreover, Tyssen's and Umbdenstock's final reports attribute the wreck of the HUICHOL to high winds and swelling seas. Since unstable weather conditions created the loss, an investigation which purportedly sought to examine the hull was initially suspect and ultimately unnecessary. Arguably, the inspection of the hull and the removal of the bodies could have occurred without the necessity of removal. This avenue of approach was not explored.

A natural point for the analysis to commence is the Port Captain's Order. Concededly, the Port Captain occupies a position of importance in the maritime industry and speaks with the force of law. Even a company as large as Protexa does not want to incur the wrath of the Port Captain. In pure economic terms, to offend the Port Captain does not make good sense. On the other hand, Protexa is a dominant force in the maritime construction industry whose corporate shadow extends beyond the Port Captain and is capable of being seen in Mexico City by the highest levels of the Mexican government.

Uriarte was a reticent legal representative at best. Because of the Christmas holidays, he twice declined to travel to Carmen and finally relented only when promised transportation by the corporate jet. Upon his arrival in Carmen on December 20, 1985, a need for immediate action was evident. Grieving families were assembled awaiting word of their missing loved ones. Protexa wanted to tell them that the wreck would be removed, a factual circumstance that had in fact commenced the preceding day. It was within this emotionally-charged atmosphere that Uriarte reviewed the Port Captain's Order.

Although Uriarte interpreted the Port Captain's Order as a removal order, no phrase in the body of the Order directs

wreck removal. Explicitly, the Order directs its attention to cleaning up the area and to the salvaging of the vessel. Salvaging does not necessarily mean wreck removal and encompasses recovery activity of something less than wreck removal. Furthermore, the Order does not order wreck removal within 25 days. What the Order does require is the posting of a bond within 25 days.

Uriarte's review of the Order and the applicable statutes contained in the order occurred within the span of 45 minutes. He then concluded the Order was valid and he and other Protexa representatives announced to those assembled that the wreck would be removed. Uriarte had no training in admiralty law and was unfamiliar with the United Nations Convention of the Law of the Sea. He also failed to engage in an effort to seek the counsel of someone who in fact did possess maritime legal experience. At this point in time Protexa anticipated spending a minimum of $3,785,800 to a maximum of $5,390,592 for wreck removal and relief upon nothing more than an oral opinion from a staff attorney. For Protexa to proceed in this fashion is not only extraordinary but incredible and casts serious doubt on the exercise of its corporate judgment.

To provide a contrast to Protexa's handling of the Port Captain's Order, the defendants produced Walter Cardwell, formerly general counsel of SEDCO, Inc. Through his script he indicated that he had experienced a situation similar to that confronted by Protexa and Uriarte. In his direct testimony through script, he stated:

I have been in the position of a ship owner faced, in the case of the drawworks of the SEDCO 135 C vessel, with a wreck removal order issued by the Port Captain of Ciudad del Carmen. In that situation, after consulting with independent counsel and weighing the costs associated with its various options, SEDCO decided not to comply with the wreck removal order issued by the Port Captain. To the best of my knowledge, the wrecked drawworks of the SEDCO 135 C remain to this day on the bottom of the sea in the same oil field as the original location of the wreck of the HUICHOL II and the removal order has never been formally rescinded.

Cardwell Script at 2.

Paragraph 4 of Cardwell's testimony is noteworthy of repeating since it places in juxtaposition what Protexa and its counsel did and what a reasonable shipowner, confronted with the same or similar situation, should have done. Moreover, the Court found Cardwell to be a very credible witness. His comments in paragraph 4 are as follows:

a. Protexa did not approach the Order in a manner consistent with a reasonable balancing of the costs of removal, the avenues of challenge available to Protexa and the cost of non-compliance with the Order. Specifically, when faced with such an order, a reasonable shipowner should determine the lowest reasonable cost of removal and balance it against the costs which can be expected to flow from possible non-compliance with the Order. The record reflects that Protexa did not seek out the advice of independent legal counsel regarding the validity and enforceability of the Order and any sanctions which might follow non-compliance. Protexa also did not secure the advice of professional deep-sea salvage consultants, nor did it engage in the customary practice of securing competitive bids from professional salvors to determine the reasonable cost of removal of the wreck.

b. However, based on the information available to Protexa at the time that the Order was issued, the balance of costs and benefits of compliance weighed heavily against compliance with the Order as it was then issued. First, the costs associated with non-compliance were not great: The Order is not even a wreck removal order per se, in that it only orders the posting of a bond, and not removal of the wreck itself. Even if it were an order of removal, it appears to be invalid on its face in that even to a non–Mexican lawyer, the statutes cited do not appear to have any application beyond territorial waters. Even beyond

that, the Mexican statutory scheme cited does not allow for any sanction against Protexa for non-compliance other than abandonment of the vessel and the possibility of a legal proceeding for the cost of removal itself. Since the cost of raising the vessel exceeded her value, abandonment was obviously no sanction at all.

c. Second, as calculated by Protexa at the time, the costs of removal were far greater than the reasonably foreseeable cost of non-compliance with the Order. Protexa projected that the minimum expected cost for removal at the time was in excess of $3,000,000. If the worst that could happen as a result of non-compliance would be for the Mexican government to assess the cost of removal, Protexa would have had the right to litigate that the charge assessed by the government be the lowest reasonable cost of removal. Protexa's maximum liability would then have been for the roughly $1 million figure that a professional salvor would have charged (referring to the bid that Smit eventually made). Even looking to the extremely conservative figures calculated by Mr. Umbdenstock (without benefit of competitive bids), the highest cost of noncompliance would have been $2.9 million.[17]

d. Thus, I conclude that Protexa acted unreasonably in hastily commencing wreck removal operations without the benefit of professional assistance in disregard of the weighing of costs associated with compliance and non-compliance with the Order.

Cardwell concluded his direct testimony with his opinion that the removal of the HUICHOL wreck was not compulsory by law.

Uriarte's visit to the Port Captain's office was a *pro forma* appearance but of little substance. He was so ill-prepared and uninformed that his application was doomed to failure even before it was presented. For example, he was unaware of whether the Mexican government had any means at its disposal to remove the HUICHOL. Tr. 322 at 10. He did not know what a third-party salvor would charge to remove the wreck. Tr. 322 at 21. No one at Protexa had told him what it was going to cost Protexa to remove the wreck. Tr. 323 at 2. He was unaware that three miles separated the HUICHOL from a Pemex platform or related structure. Tr. 329 at 10. In terms of sanctions, he admitted that forfeiture of the HUICHOL to the Mexican government was not a sanction that required the Order to be obeyed. Tr. 329 at 24. Protexa further stipulated that the threat of fines was not the primary motivating factor for the removal of the wreck. Tr. 331–24 to 332–1. Without further belaboring this opinion with Uriarte's cross-examination, it is important to note that he did not make a technical presentation to the Port Captain pertaining to the wreck constituting a hazard to navigation. Tr. 335 and 6. In fact, Uriarte agreed with the Port Captain that the wreck was a hazard to navigation. Tr. 335 at 3. The commercial and moral implications that AAMS asserts motivated Protexa to remove the wreck are documented in Uriarte's cross-examination. Tr. 336–17 to 337–11.

AAMS proffered the testimony of David Pockett, who has 15 years experience as a marine consultant to various interests involved in marine casualties. He has been involved on numerous occasions in wreck removal and salvage operations throughout the world, including Mexico, on behalf of both ship owners and insurance interests. The Court found Pockett, like Cardwell, to be an exceedingly credible witness. His findings as set forth in the subparagraphs of paragraph 5 of his script bear repetition, as follows:

a. Protexa did not approach the removal Order in a prudent and realistic manner consistent with a reasonable balancing of the costs of removal, the avenues of challenge available to Protexa and the consequences of non-compliance with the Order. Generally, it has been

---

17. The factual predicate for Cardwell's information as to the reasonable cost of removal is found in Umbdenstock's Script at 9.

my experience throughout the world that government marine officials of democratic nations such as Mexico keep an open mind to well-reasoned presentations by shipowners, prepared in connection with advice from professional marine consultants and other professionals, that request retraction or modification of wreck removal orders. Protexa could have and, in discharging its duties as a prudent uninsured, should have immediately upon receipt of the Order retained a professional salvage consultant to assist in the preparation of such a presentation.

b. Based on the information available to Protexa at the time that the Order was issued, sufficient data could have been presented to show that in fact the wreck of the HUICHOL II did not have to be removed. Thus, Protexa should have met with the Mexican marine authorities and demonstrated that the wreck of the HUICHOL II, as it lay immediately after its sinking, presented no hazard to navigation, the marine environment or to offshore activity in the Pemex oil field. Such a request, when accompanied by a well-prepared presentation by professional marine consultants, would have at least resulted in the government recognizing the need to allow Protexa sufficient time to secure bids from professional salvors and very well may have resulted in a complete retraction of the Order. Instead, the record reflects that Protexa at most, engaged in a half-hearted informal challenge to the Order that was not based on any proper technical analysis of the situation of the wreck or the costs to be expected in its removal.

c. In other instances in which I have been involved where wreck removal orders have been issued, it has been my experience that, where a ship owner undertakes a professionally-supported analysis of the technical aspects of wreck removal and engages the government authorities in concerted dialogue about the practical aspects of removal, removal has been avoided without economic or legal consequence to the owners [or] their insurers.

d. Protexa did not approach the technical task of wreck removal in a reasonable fashion. Although Protexa is a competent offshore construction firm, salvage is a service it neither offers nor is it a service it boasts of being capable of performing. Indeed, there are no salvage companies of repute in Mexico. In such a case immediate contact with professional international salvage firms, such as Smit International, Wiljsmuller and Bugsier, is a minimum step necessary to ascertain the potential costs of removal. Such salvage firms are always willing to make a survey of the casualty and submit a bid at no cost. In my opinion, a professional salvor would have completed removal of the HUICHOL II within 30 days.

e. The only way to determine the commercially reasonable cost of a deep-sea removal job of the obvious difficulty posed by the wreck of the HUICHOL II is to invite bids by two or more of the universally-recognized professional salvage firms. Thus it was entirely unreasonable for Protexa to commence wreck removal operations without taking such a step.

f. Furthermore, based on my experience in deep-sea salvage and wreck removal jobs worldwide, I conclude that the cost figures quoted by Protexa for undertaking the removal of the wreck of the HUICHOL II were also far above any reasonable amount. Even its initial lump-sum bid of roughly $3,000,000 was exorbitant. Beyond that, its "day rate" of almost $225,000 per day was far too high. Finally, its final request for over $10,000,000 is beyond any reasonable charge for the removal by a factor of ten. I believe that $1 million would have been a reasonable charge, on a lump sum, no-cure, no-pay basis, for removal of the wreck of the HUICHOL II.

g. The wreck of the HUICHOL II posed no hazard to navigation or the marine environment as it lay immediately after it sank: Given its depth and the bottom condition, the wreck would not have moved on the bottom, it was in an

area marked "Anchorage Prohibited" on nautical charts and it did not have significant amounts of potential pollutants aboard.

Protexa's failure to engage in the type of conduct prescribed by Pockett was unreasonable at the very best and irresponsible at the very least.

The sanctions that Uriarte recounted for the Protexa response team, *see supra* at 1215–1216, were in fact meaningless and lacked persuasive value. Removal of the HUICHOL by the Mexican government or through a third-party salvor in light of the Protexa-estimated cost of removal was no sanction. The potential for catastrophic liability to third-parties if the wreck were to move within the oil field was remote, particularly in view of the three mile distance between the wreck and any Pemex installation. In *Bonanza,* the insured, Conoco, removed a wreck which had sunk off the coast of Texas in the midst of an offshore oil field, claiming that if the wreck moved in a storm and damaged a pipeline Conoco could face an immense adverse potential damage award. 706 F.2d at 1372–1373. Yet, even though the cost of removal was relatively small in comparison to the potential damage award, the court found the removal of the vessel was not compulsory by law in that Conoco's potential liability was too remote. *Id.* The court held that for removal to be compulsory by law there must be a present and unconditional duty. In particular, the court stated that "[t]he possibility that, by an extension of maritime law not yet decreed, Conoco might be held liable in the future should [the vessel] be dislodged from the mud and propelled against other structures is not such a legal obligation." *Id.* at 1373. Accordingly, the Court does not view Protexa's potential liability for damage as an appropriate sanction to be factored into the compulsory by law equation.

The sanctions of fines and the risk of loss of the bond amounted in total to approximately $50,000. They could not in this factual scenario, either individually or cumulatively, amount to a sanction.

Lastly, Uriarte directed his legal compass toward the grave consequences Protexa could experience with the Mexican government and Pemex if Protexa were to disobey an obviously valid order. In his cross-examination, Mollman acknowledged that commercial pressure would not satisfy the compulsory by law standard of the policy. Tr. 176 at 6 to 177–10.

The Court has exhaustively reviewed the evidence presented and without hesitation concludes that Protexa has not satisfied the analytical framework that defines the concept of compulsory by law. Protexa, looking at the state of affairs at or near the sinking of the HUICHOL, responded out of moral and commercial necessity. Whether humanitarian instincts predominated in Protexa's thinking is not for this Court to speculate. The commercial aspects of its thought process are self-evident truths that do not require further explication.

Protexa did not act as a reasonable owner under the circumstances. Its failure to remove the HUICHOL was not likely to expose it to liability imposed by law sufficiently great in amount and probability of occurrence to justify the expense of removal. Accordingly, the Court determines that the wreck removal of the HUICHOL was not compulsory by law.

### B. *Prudent Uninsured*

■ Protexa knew that the policy of insurance required it to act as a prudent uninsured. Exhibit 258 at 40000591. By the terms of the policy in its pertinent part, it provided "that in respect of any occurrence likely to give rise to a claim under this policy, the Assured are obligated to and shall take steps to protect their (and/or the Assurer's) interests as would reasonably be taken in the absence of this or similar insurance." An insured has a duty to exercise the care of a prudent, uninsured owner with respect to the insured property. *See generally Blasser Bros. v. Northern Pan–American Line,* 628 F.2d 376, 386 (5th Cir.1980) (duty to exercise care of prudent, uninsured owner under sue and labor clause). Not only was Protexa charged

with knowledge of the language of the policy but had been warned by both Mollman, Exhibit 266, and by Guerrero, Exhibit 24, of this obligation.

■ When Protexa acted as its own salvor it failed to act as a prudent uninsured. From the deposition testimony of Cruz and Uriarte, it is abundantly clear that Protexa had no experience in deep water wreck removal operations. Protexa was a maritime construction company and not a wreck removal salvor. Therefore, when Mollman contacted the primary level reinsurers and communicated to them Protexa's offer to remove the HUICHOL, he did so under the apprehension that Protexa possessed the expertise to handle the wreck removal. Mollman Script at 11. The misinformation was compounded when Mollman further advised those very same underwriters that immediate removal was required to minimize expenses because the HUICHOL was sinking in the mud. At the time Mollman was relying on Tyssen's evaluation which Mollman assumed was communicated to Tyssen directly by Protexa's divers who had surveyed the sea bottom in aid of the removal plan's preparation. Mollman Script at 7–8. However, during his depositions, Tyssen conceded that he had never spoken to the divers. Dep. 178 at 20. Indeed, it was Protexa's conclusion that the vessel was sinking in the mud and not Tyssen's independent conclusion. Dep. 180 at 7.

The notice to the underwriters left much to be desired. None of the excess level underwriters had been contacted when Mollman told Protexa that the underwriters had approved Protexa as a salvor. Tyssen Dep. 310 at 3. Also see Tyssen Dep. 200 at 3, 61 at 14 and 39 at 13. In his script at 13, Mollman points to Tyssen as the one who told Cruz that the underwriters had approved Protexa to do the job and that Protexa should start the job immediately. The irony of receiving the consent of only the primary level underwriters is striking in view of their $2,500,000 limit of liability and the potential that the hull and cargo loss would consume most of the primary layer of insurance. Surely, if Protexa was looking for approval and acting prudently, it would have demanded to see a writing that would indicate both Lloyds' and AAMS' approval.

AAMS never did accept Protexa as its own salvor nor did it agree to the day rate of $224,000. In fact, AAMS sent a telex on December 20, 1985 with the request that a third-party salvor, as much as possible, get involved in the removal of the vessel. On December 23, 1985 AAMS, in a telex to Tyssen, sought information as to whether there had been a mandate from a regulatory body requiring Protexa to remove the HUICHOL from its present location. Exhibit 34. Despite AAMS's request, Protexa proceeded to act as its own salvor. On January 9, 1986 AAMS received a telex from Mollman which was a repeat of Tyssen's report that the wreck removal estimate was $7,300,000 and that the target date for completion of the entire salvage job is between January 13–18. Exhibit 44. In a series of telexes transmitted between January 13 and January 21, 1986, AAMS voiced its concerns as to the reasonable expense of the wreck removal. Exhibits 46, 52 and 57. Meanwhile, Pritchett, who was AAMS's surveyor at the scene, on January 17, 1986, recommended that the salvage operation be placed out for competitive bids. Exhibit 51.

While Protexa was engaged in the salvage of the HUICHOL and AAMS was cast in the role of the "sore loser," a world-renowned and acknowledged third-party salvor, Smit International, sought to become involved in the wreck removal of the HUICHOL. Fredericks Script at 2. Also see Exhibit 333. Smit also contacted RJA and Mollman to offer to perform the removal of the wreck. Fredericks Script at 3. Smit, however, was not invited to bid until late January of 1986 and at that time offered to perform the wreck removal for $1.125 million on a lump sum, no cure, no pay basis.[18] Exhibit 97.

---

**18.** A lump sum, no cure, no pay basis means that the salvor is paid only on the condition that it successfully removes the wreck.

On January 20, 1986 the wreck removal of the HUICHOL was foundering to say the least. Another experienced salvor, Alex Rynecki, Inc., was contacted by Tyssen and retained by Protexa as its salvage consultant. Rynecki assigned Robert Umbdenstock to the project. After his arrival on the site on January 21, 1986, Umbdenstock advised Cruz that the only way to determine the reasonable cost for the wreck removal operation would be to secure competitive bids. Umbdenstock estimated that a commercial salvor would bid between $1.1 million and $2.9 million dollars. Exhibits 69, 290 and 291.

Although Umbdenstock agreed that Protexa's removal plan was conceptually sound, he found its execution was inadequate. In paragraph 8 of his script he criticized the lack of experienced salvage divers and their use of surface-supplied air. In paragraph 9, he commented on the lack of effective on-site management and the absence of experienced salvage professionals involved in the wreck removal effort. Furthermore, despite the fact that he made recommendations to Protexa as their salvage consultant, Protexa failed to implement any of these recommendations. Umbdenstock Script at paragraph 11.

Umbdenstock concluded that Protexa acted unreasonably in hastily commencing wreck removal operations without the benefit of professional assistance in determining the difficulties involved and the commercially reasonable cost of such an operation. His paragraph 13 conclusions, subparagraphs (a)-(h) are particularly damning to Protexa's conduct. Subparagraph (f) is representative of his negative commentary. In it he stated as follows:

As carried out by Protexa, the wreck removal presented a threat to the safety and lives of the divers involved. Without adequate, experienced on-site management, the Protexa divers were forced to undertake the task of recovering the wreck of the HUICHOL II in an inefficient manner. The diving techniques employed by Protexa were inappropriate and needlessly risked the divers' safety as well. The divers working at extreme depths on surface-supplied air were able to spend very little time per dive on the bottom which resulted in inefficient and duplicative tunneling efforts. On many occasions, I observed that the diving operations resulted in little or no progress being accomplished for long periods of time. Protexa's approach to the wreck removal operation showed a lack of experience in this sort of operation.

Umbdenstock was an experienced marine salvage consultant and a credible witness before the court.

Even more demonstrative in his criticism is Richard Fredericks, who currently is employed by a non-profit, nationwide marine oil spill response facility. He spent more than 20 years in the marine salvage field. At the time that the HUICHOL sank, he was vice president of Smit Salvage, Inc. Smit, at that time, was engaged in the wreck removal of the TAURO DEL GOLFO, a craft of about the same size as the HUICHOL and which had sunk only 13 miles away. Fredericks Script at 8. Smit raised the TAURO DEL GOLFO for the no cure, no pay price of $580,000. In subparagraphs (a)-(g) of paragraph 12, he states as follows:

a. Protexa did not approach the removal of the wreck of the HUICHOL II in a reasonable manner. A vessel of the size of the HUICHOL II lying in over 130 feet of water in an inverted position in exposed waters during a period when inclement weather can be expected presents a wreck removal job to be undertaken only by experienced, professional salvors. From both cost and safety viewpoints, such a job should not be undertaken by a firm whose experience is limited to offshore oilfield construction.

b. The physical situation of the wreck of the HUICHOL II immediately after it sank should have been assessed by professional salvors or salvage consultants. Without supervision by experienced salvors, the oilfield construction divers employed by Protexa to survey the wreck cannot be counted on to accurately observe and report on the condition of the wreck. Thus, I have little confidence in the accuracy of Protexa's assessment

that the vessel was 'rapidly filling with mud' immediately after it sank. Smit or any other professional salvor would have been willing to immediately conduct a professionally-supervised diving survey of the wreck of the HUICHOL II at any time. Such a survey could have been completed within 48 hours at any time after the HUICHOL II sank.

c. Even if the vessel were 'rapidly filling with mud' after it sank, professional salvors would have been able to raise the wreck of the HUICHOL II in a much more economical fashion than Protexa claims to have done.

d. Protexa carried out the removal of the wreck of the HUICHOL II in a completely unprofessional manner: the wrong equipment was used by the wrong people in the wrong way. As is set out above, Protexa's large crane-ship TOLTECA was not needed for the HUICHOL job. In the hands of professional salvors, a smaller crane, such as Smit's TAK LIFT I could have done the job safely. As carried out by Protexa, the wreck removal presented a threat to the safety and lives of the divers involved. Without adequate, experienced management, the Protexa divers were forced to undertake the emotionally harrowing task of attempting the recovery of the bodies of their own fellow workers in an inefficient manner that needlessly risked their lives. With proper foresight, the dangerous and inefficient tunneling operation which took up most of the time during which Protexa worked on the job could have been avoided: the wreck could have and should have been raised in an inverted position with the aid of compressed air. Even assuming that the wreck had to be uprighted on the bottom prior to lifting, more effective means could have been employed to do so. Rather than uprighting the vessel and then passing lifting straps beneath her, the vessel could have been uprighted onto the straps which were to be used. Although Protexa apparently attempted to do this without success, with more planning it could have been done without the need for the subsequent tunneling operation. Finally, the diving techniques employed by Protexa were inadequate as well as unsafe. Without effective management, the divers working at extreme depths on surface-supplied air were able to spend very little time working on the bottom and certainly engaged in inefficient and duplicative effort. All in all, Protexa's approach to the problem was unsophisticated and showed a complete lack of experience in this sort of operation.

e. The amount of money claimed by Protexa for performing the wreck removal is far higher than the figure which would have been charged by a professional salvor. Under no circumstances would a professional salvor have charged the over $10,000,000 claimed by Protexa. In my experience, Smit's bid of $1.125 million is a reasonable charge for a wreck removal such as that of the HUICHOL II. In fact, if Smit had been retained to remove the HUICHOL II as it lay when it originally sank, a charge closer to the $580,000 charged in the case of the TAURO wreck removal would have been more likely.

f. The wreck of the HUICHOL II posed no hazard to navigation or the marine environment as it lay immediately after it sank: Given its depth and the bottom condition, the wreck would not have moved on the bottom, it was in an area marked 'Anchorage Prohibited' on nautical charts and it did not have significant amounts of potential pollutants aboard.

g. Thus, I conclude that Protexa acted unreasonably in hastily commencing wreck removal operations without the benefit of professional assistance in determining the difficulties involved and the commercially reasonable cost of such an operation. Beyond that, the operation was carried out in a dangerous and unprofessional manner and took far longer than necessary at a cost far in excess of what the market for such services was at the time.

The testimony of Umbdenstock and Fredericks remains uncontroverted. Neither

Mollman, Tyssen or Cruz possessed any marine salvage expertise. No Protexa employee testified to the manner in which the removal plan was implemented. Moreover, Mollman and Tyssen operated under the mistaken premise that Protexa was a qualified salvor, since the operation was merely a lifting and diving operation. The Court has no doubt that Protexa lacked the expertise and oversight requisite to the HUICHOL's removal.

A prudent uninsured would have immediately sought the services of a third-party salvor, and if none were available, would have sought an extension of time from the Port Captain. A snippet of candor from Protexa about its lack of expertise in a deep water wreck removal also would have been far more prudent than the course of action it pursued. Clearly, Protexa did not engage in conduct which tended to prevent or minimize AMMS's loss. Protexa did not act as a prudent uninsured.

## IV. CONCLUSION

Because the wreck removal of the HUICHOL was not compulsory by law and because Protexa failed to act as a prudent uninsured, judgment shall be entered in favor of the defendants. Either of these grounds is sufficient to mandate a judgment in favor of the defendants.